809 A.2d 91

STEVEN M. LONEGAN; STOP THE DEBT.COM, LLC, PLAIN-
TIFFS–APPELLANTS, v. STATE OF NEW JERSEY; ROLAND
M. MACHOLD, TREASURER OF THE STATE OF NEW JER-
SEY; NEW JERSEY SPORTS AND EXPOSITION AUTHORITY;
NEW JERSEY EDUCATIONAL FACILITIES AUTHORITY;
NEW JERSEY ECONOMIC DEVELOPMENT AUTHORITY;
NEW JERSEY TRANSPORTATION TRUST FUND AUTHORITY,
DEFENDANTS–RESPONDENTS.

Argued January 2, 2002—Decided August 21, 2002.

*Andrew T. Fede,* argued the cause for appellants (*Contant, Atkins, Rogers, Fede & Hille,* attorneys).

*Allison E. Accurso,* Assistant Attorney General, argued the cause for respondents State of New Jersey, Roland M. Machold, Treasurer of the State of New Jersey, New Jersey Educational Facilities Authority, New Jersey Economic Development Authority and New Jersey Transportation Trust Fund Authority (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney; *Patrick DeAlmeida,* Deputy Attorney General, on the briefs).

*Matthew C. Johnston,* on behalf of respondent New Jersey Sports and Exposition Authority, relied upon the brief submitted on behalf of State of New Jersey, et al., (*Courter, Kobert, Laufer & Cohen,* attorneys).

*David G. Sciarra,* Executive Director, Educational Law Center submitted a brief on behalf of amicus curiae Abbott Plaintiffs (*Mr. Sciarra,* attorney; *Mr. Sciarra* and *Paul J. Dillon,* on the brief).

*Andrea L. Kahn,* submitted a brief on behalf of amicus curiae Garden State Coalition of Schools (*McManimon & Scotland,* attorneys).

*Douglas S. Eakeley* submitted a brief on behalf of amicus curiae League of Women Voters of New Jersey (*Lowenstein Sandler,* attorneys; *Cecelia E. Haney* and *Maria N. Maccone,* on the brief).

*Melissa R. Vance,* Counsel, submitted a letter in lieu of brief on behalf of amicus curiae New Jersey Association of School Administrators.

*Richard A. Friedman,* submitted a letter in lieu of brief on behalf of amicus curiae New Jersey Education Association (*Zazzali, Fagella, Nowak, Kleinbaum & Friedman,* attorneys; *Mr. Friedman* and *Kimberly A. Scurti,* on the brief).

*Michael F. Kaelber,* Senior Associate Counsel, submitted a letter in lieu of brief on behalf of amicus curiae New Jersey School Boards Association (*Cynthia J. Jahn,* General Counsel, attorney).

*John L. Kraft,* submitted a letter brief on behalf of amicus curiae United Taxpayers of New Jersey.

The opinion of the Court was delivered by

PORITZ, C.J.

In this case the Court is asked to consider once again the contours of Article VIII, Section II, paragraph 3 (the Debt Limitation Clause or Clause) of the New Jersey Constitution. The scope and meaning of the restrictions imposed on the legislative branch by the Clause have been discussed at length in an

extensive body of case law spanning more than fifty years and covering a variety of bonding mechanisms adopted by the Legislature to meet the capital funding needs of the State. *See, e.g., Enourato v. N.J. Bldg. Auth.,* 90 *N.J.* 396, 448 *A.*2d 449 (1982); *N.J. Sports & Exposition Auth. v. McCrane,* 61 *N.J.* 1, 292 *A.*2d 545, *appeal dismissed sub nom., Borough of E. Rutherford v. N.J. Sports & Exposition Auth.,* 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.*2d 215 (1972); *Holster v. Bd. of Trs. of Passaic County College,* 59 *N.J.* 60, 279 *A.*2d 798 (1971); *Clayton v. Kervick,* 52 *N.J.* 138, 244 *A.*2d 281 (1968); *N.J. Tpk. Auth. v. Parsons,* 3 *N.J.* 235, 69 *A.*2d 875 (1949). In those cases the Court has almost universally sustained statutes authorizing the issuance of debt that is not backed by the full faith and credit of the State, generally when the debt is undertaken by an independent authority, most often when that authority has a revenue source available to service the principal and interest on the debt. The Court has reasoned that the Debt Limitation Clause is not implicated when the State is not legally obligated on debt issued subject to future annual appropriations.

■    Plaintiffs challenge the State's use of contract debt [1] without voter approval because in their view it is "inconceivable ... that the State Legislature will fail to make the necessary appropriations to prevent a default." Despite the "subject to annual appropriation" language in the contracts, plaintiffs claim that the potential negative impact of a default on the State's credit rating ensures that the Legislature will appropriate the amounts necessary to cover debt service obligations on contract bonds. They urge the Court to reevaluate its prior holdings, curtail sharply the State's use of such capital financing, and rule impermissible

---

[1] The term "contract bond" (or "contract debt") describes bonds issued by an independent state authority on a contract between the State Treasurer and the authority stating that payment on the bonds by the State is subject to legislative appropriations. In contrast, general obligation bonds are enforceable state debts backed by the full faith and credit of the State. John Downs & Jordon Elliott Goodman, *Barron's Dictionary of Finance and Investment Terms* 171 (1991).

without voter approval the creation by the Legislature of contract debt or debt subject to appropriations.

Plaintiffs raise important and difficult issues. This Court, in a virtually unbroken line of precedent, has applied the Debt Limitation Clause literally, holding that when the full faith and credit of the State is not pledged the debt is not the debt of the State. That clear, bright line has appeared to serve well the financial needs of the State while, at the same time, remaining true to the meaning of the Clause. But, more recently, there have been substantial changes in the State's debt arrangements and whether the Clause, as interpreted, retains its fundamental purpose and vitality is today a troubling question. A literal interpretation of the Debt Limitation Clause that eviscerates the strictures the Clause expressly contains cannot serve the constitutional mandate.

That said, we are not in a position to rule on those issues without additional argument. Plaintiffs' broad challenge lists statutes containing a variety of financing strategies structured as contract debt that have been reviewed by this Court and thereafter sustained, see, e.g., N.J.S.A. 52:18A:78.1 to –78.32 (New Jersey Building Authority Act) [2], as well as "all other statutes that offend the Debt Limitation Clause." Those strategies must be viewed in context to be understood. Simply put, plaintiffs' sweeping claim that all contract debt is invalid must be anchored in a discussion of the financing mechanisms authorized in specific legislative enactments. Therefore, except for the Education Facilities Construction and Financing Act (EFCFA or the Act), which we sustain, we direct the Clerk of the Court to schedule this matter for additional briefing and reargument as soon as practicable in the fall of 2002.

In respect of EFCFA, plaintiffs' argument focuses on that statute "and the contract bond ... authorized." *Lonegan v. State,*

---

[2] The Building Authority Act was sustained in *Enourato, supra,* 90 *N.J.* at 410, 448 *A.*2d 449 (holding that "[s]ince the Building Authority Act does not authorize the creation of any debts by the State, the debt limitations clause ... does not apply to the Authority's debts or any obligations of the State on its lease agreements with the Authority").

341 *N.J.Super.* 465, 481, 775 *A.*2d 586 (App.Div.2001). We consider EFCFA herein because the argument in respect of the Act is put forward with particularity; we uphold the Act because of reliance by the State on our prior case law, including *Abbott v. Burke,* 153 *N.J.* 480, 710 *A.*2d 450 (1998) (*Abbott V*), and for the separate and distinct reason that EFCFA was enacted by the Legislature in furtherance of the mandate found in Article VIII, Section IV, paragraph 1 (the Education Provision) of the New Jersey Constitution.

I

On December 28, 2000, plaintiffs filed a Verified Complaint in Lieu of Prerogative Writs in the Superior Court, Law Division, seeking injunctive relief and a declaratory judgment that EFCFA and other statutes authorizing contract bond financing are unconstitutional. Plaintiffs named the State of New Jersey, Roland Machold (then Treasurer of the State of New Jersey), the New Jersey Educational Facilities Authority, the New Jersey Economic Development Authority (EDA), the New Jersey Sports and Exposition Authority, and the New Jersey Transportation Trust Fund Authority as defendants.[3] Shortly thereafter the trial court determined that plaintiffs could not demonstrate a reasonable likelihood of success on the merits warranting an injunction. In then granting summary judgment to defendants on all claims, the court observed that this Court has repeatedly rejected challenges to contract bonds issued by independent authorities when the pay-

---

[3] Each of the independent entities named has statutory authority to issue contract bonds. *N.J.S.A.* 34:1B–7.16 (EDA); *N.J.S.A.* 34:1B–7.50 (same); *N.J.S.A.* 34:1B–21.13 (same); *N.J.S.A.* 18A:72A–5 (New Jersey Educational Facilities Authority); *N.J.S.A.* 18A:72A–12.4 (same); *N.J.S.A.* 18A:72A–42 (same); *N.J.S.A.* 18A:72A–57 (same); *N.J.S.A.* 72A–65 (same); *N.J.S.A.* 5:10–5 (New Jersey Sports and Exposition Authority); *N.J.S.A.* 5:10–14.3 (same); *N.J.S.A.* 27:1B–6 (New Jersey Transportation Trust Fund Authority). In their brief to this Court, plaintiffs also point to other statutes, mentioned by the Appellate Division, as unconstitutionally authorizing contract debt, and, as noted above, "all other statutes that offend the Debt Limitation Clause."

ment on the bonds is made subject to future legislative appropriations.

A majority of the Appellate Division panel affirmed the trial court on June 27, 2001.[4] *Lonegan, supra,* 341 *N.J.Super.* at 481–82, 775 *A.*2d 586. After discussing the mechanics of contract bond financing, the majority observed that unlike general obligation bonds, which are backed by the full faith and credit of the State, contract bonds do not create a "legal right to compel" the State to make payment on the bonds. *Id.* at 472, 775 *A.*2d 586. The majority also considered our precedents in respect of the Debt Limitation Clause, concluding that the relevant case law "reveal[s] a consistently narrow construction of the ... Clause by the Court, so that as long as future Legislatures are not legally bound to make future appropriations to pay the indebtedness the [C]lause is satisfied." *Id.* at 478, 775 *A.*2d 586. Although the majority could find no case addressing contract debt as such, the "rationale" of our prior cases suggested that the Debt Limitation Clause is satisfied even when an independent authority issuer has no separate source of income and is dependent on annual legislative appropriations to pay the amount due on the bonds. *Ibid.* In the view of the majority, because the purpose of the Clause is to prevent a default by the State, the "strictures of the ... Clause [are] met if the State is not obligated on the bonds and cannot default." *Ibid.* Based on that reasoning, the majority sustained EFCFA.

Notably, the two judges speaking for the court expressed approval of their dissenting colleague's approach, stating: "Were we not barred by that precedent we might join in our colleague's thoughtful dissenting opinion." *Id.* at 481 n. 9, 775 *A.*2d 586. The dissenting member of the panel would have held that contract bonds violate the Debt Limitation Clause. *Lonegan, supra,* 341 *N.J.Super.* at 482, 775 *A.*2d 586 (Wells, J.A.D., dissenting). In his

---

4 Plaintiffs were denied preliminary relief in the Appellate Division on March 26, 2001, and in this Court on September 21, 2001.

view, there is little if any difference between debt that the State is legally obligated to pay and debt that the State is morally obligated to pay. He observed that Moody's [5] considers " 'appropriation debt [to be] no different than 'true' debt.' " *Id.* at 484, 775 *A.*2d 586 (citation omitted). In respect of EFCFA, the dissent concluded that the EDA is simply a conduit for the sale of school construction bonds whose cost ultimately will be borne by the taxpayers because no other revenue source is available for that purpose. *Id.* at 483, 775 *A.*2d 586.

## II

EFCFA follows a long line of statutes authorizing debt that has not been subject to the restrictions of the Debt Limitation Clause. The genesis of the Clause and the extensive case law interpreting it provide a framework for analysis and consideration of the Act, and for an understanding of the various questions posed by plaintiffs' challenge.

## A

As in most states, New Jersey's Debt Limitation Clause had its origins in the depression years that followed the economic boom of the 1830s. See Margaret G. Myers, *A Financial History of the United States* 143 (1970). In the late 1830s, only a handful of states had refrained from issuing long-term debt in connection with a variety of projects, including such "public improvements" as

---

[5] Moody's (Moody's Corporation or Moody's Investors Service) describes itself as

a leading global credit rating, research and risk analysis firm that publishes credit opinions, research and ratings on fixed-income securities, other credit obligations and issuers of securities.... The company publishes rating opinions on a broad range of credit obligations. These include various corporate and governmental obligations, structured finance securities and commercial paper programs issued in domestic and international markets. [Moody's, *About Moody's: Introduction to Moody's, at* http://www.moodys.com/moodys/cust/staticcontent/2000200000265777.asp? section=about & topic=intro.]

the expansion and development of canals, roadways and railroads. *Ibid.;* see *Clayton, supra,* 52 *N.J.* at 146–47, 244 *A.*2d 281; *McCutcheon v. State Bldg. Auth.,* 13 *N.J.* 46, 67, 97 *A.*2d 663 (1953) (Jacobs, J. dissenting), *overruled by Enourato, supra,* 90 *N.J.* at 410, 448 *A.*2d 449; V *Proceedings of the Constitutional Convention of 1947: Committee on Taxation and Finance* 590 (1953); Amos Tilton, *Constitutional Limitations on the Creation of State Debt, in* II *Constitutional Convention of 1947* 1708 (1951); Susan Oxford, *Voters' Right to Approve State Debt—How Much Choice is Allowed?* New Jersey Association on Correction v. Lan, 33 *Rutgers L.Rev.* 198, 202 (1980). During the years of prosperity, the states easily sold their bonds and many states engaged in heavy borrowing to support those and other projects. *Clayton, supra,* 52 *N.J.* at 146, 244 *A.*2d 281; *McCutcheon, supra,* 13 *N.J.* at 67–68, 97 *A.*2d 663 (Jacobs, J., dissenting). The boom was followed, however, by the failure of American crops in 1835 and 1837, leading to the panic of 1837 and the banking collapse of 1839. Davis Rich Dewey, *Financial History of the United States* 243–44 (1903); Tilton, *supra,* at 1709. The states most affected had speculated in western lands, become involved in the cotton trade or state banking schemes, or had invested in the Erie Canal. Dewey, *supra,* at 224–27. By 1842 nine states had defaulted on their obligations. Tilton, *supra,* at 1709.

Although New Jersey was not a defaulting state, it nonetheless sought to protect against the type of financial debacle experienced elsewhere by adopting, in 1844, one of the first debt limitation clauses in the country. *N.J. Const. of 1844,* art. IV, § 6, ¶ 4; *Proceedings of the Constitutional Convention of 1844* 311 (1942); Tilton, *supra,* at 1709; Oxford, *supra,* 33 *Rutgers L.Rev.* at 202. At that time, the framers expressed their concern about "opening a door for burthening the State with a debt which would encumber it from generation to generation." *Proceedings of the Constitutional Convention of 1844* 519 (1942). Later, the Court, echoing the framers' concern, explained that the Clause "prohibits 'one Legislature from incurring debts [that] subsequent Legislatures would be obliged to pay, without prior approval by public referen-

dum.'" *City of Camden v. Byrne,* 82 *N.J.* 133, 152, 411 *A.*2d 462 (1980) (quoting *N.J. Sports & Exposition Auth., supra,* 61 *N.J.* at 13–14, 292 *A.*2d 545).

The predecessor clause remained essentially unchanged in the Constitution of 1947 except that the amount of permissible unrestrained debt in a given year was altered from a predetermined amount ($100,000) to one-percent of the amount appropriated by the Legislature in the general appropriation act for that fiscal year. *N.J. Const.* art. VIII, § 2, ¶ 3; see *McCutcheon, supra,* 13 *N.J.* at 67, 97 *A.*2d 663 (Jacobs, J., dissenting). With that exception, today, as in 1844, the Debt Limitation Clause states, in relevant part:

> The Legislature shall not, ... create in any fiscal year a debt or debts, ... which together with any previous debts or liabilities shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law for some single object or work distinctly specified therein.... [S]uch law shall provide the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal thereof within thirty-five years from the time it is contracted; and the law shall not be repealed until such debt or liability and the interest thereon are fully paid and discharged. No such law shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon.
>
> [art. VIII, § 2, ¶ 3.]

### B

In *In re Loans of the New Jersey Property Liability Insurance Guarantee Association,* 124 *N.J.* 69, 75–76, 590 *A.*2d 210 (1991), we explained that the cases

> in which this Court has construed the debt limitation clause fall into two categories. One group of decisions holds that the constitutional provision does not apply to the creation of debt by independent public corporate entities, ... [whereas] a second line of decisions generally find[s] that legislative expressions of intent to provide future funding do not create present debts of the State subject to the debt limitation clause....

That formulation provides a convenient way to examine our case law, although there are other interpretive strands woven throughout various of the Court's opinions as well as substantial overlap between the two categories. Thus, for example, certain of the

cases suggest that when the Legislature has established an independent revenue source for debt repayment, *e.g.*, turnpike tolls, or when payment from general appropriations would in any event be a necessary expenditure, *e.g.*, lease installments for government offices, the Debt Limitation Clause is not violated. *See, e.g., Enourato, supra,* 90 *N.J.* at 409–10, 448 *A.2d* 449 (discussing funding source for payment of bond principal and interest in lease case); *N.J. Sports & Exposition Auth., supra,* 61 *N.J.* at 25, 292 *A.2d* 545 (explaining that "[f]unds to meet interest and principal of the bonds are derived solely from revenues generated by the agency's operation, which remain a special fund for that purpose until the bonds are fully paid"); *Clayton, supra,* 52 *N.J.* at 154–55, 244 *A.2d* 281 (discussing independent revenue source and lease payments). Those sub-themes are important in respect of the issues raised by plaintiffs' challenge and we will return to them. See *infra* at 447, 450–53, 462–63, 809 *A.2d* at 98, 99–101, 107–08. An overview of our cases suggests, however, that whatever way they are grouped and whatever the focus in a particular case, our prior holdings generally consist of variants on a single theme: the Debt Limitation Clause applies only when the State is legally obligated to make payments on the debt authorized by the Legislature.

The cases involving independent authorities are exemplars of that theme. We have, with rare exception, held that independent state authorities issuing bonds or other debt obligations that are not backed by the State's full faith and credit are not debts of the State for purposes of the Debt Limitation Clause. *See, e.g., In re Loans, supra,* 124 *N.J.* at 75, 590 *A.2d* 210 (citing cases that hold Debt Limitation Clause does not apply to debt created by independent public corporate entities); *Enourato, supra,* 90 *N.J.* at 410, 448 *A.2d* 449 (noting that "[a]lthough the [Building Authority] Act not only contemplates that the State will make the necessary appropriations but also seeks to ensure this result, the State is under no legal obligation to do so") (internal citation omitted). *But see McCutcheon, supra,* 13 *N.J.* at 66, 97 *A.2d* 663, *overruled by Enourato, supra,* 90 *N.J.* at 410, 448 *A.2d* 449 (declaring void Building Authority's leases, contracts, and proceedings because "it

is fundamental in the Constitution that, ... one Legislature cannot charge succeeding Legislatures with the duty of making appropriations"). More than fifty years ago, in *New Jersey Turnpike Authority, supra*, the Court reviewed a statute authorizing the Turnpike Authority to construct and maintain "modern express highways" through the issuance of bonds "payable solely from tolls and revenues." 3 *N.J.* at 238, 69 *A.*2d 875 (citations omitted). Despite the "explicit and unambiguous language of the statute [that] entirely negatives any possibility of the proposed bonds being [i]n any manner debts or liabilities of the State ... 'or a pledge of the faith and credit of the State,'" *id.* at 242, 69 *A.*2d 875, it was argued that the debts of the Turnpike Authority, a creature of the State, were the responsibility of the State. *Id.* at 243, 69 *A.*2d 875.

Writing for the Court, Chief Justice Vanderbilt rejected that argument. Relying on a substantial body of law that defines public corporations such as the Turnpike Authority as "independent entities," he determined that "the State is not responsible for their debts and liabilities." *Ibid.* Because an independent authority stood between the bondholder and the State, because the authority, not the State was legally obligated on the debt, the Debt Limitation Clause was not violated. The Court found it unnecessary in that case to reach the question whether bonds supported by a revenue source independent of the taxing power, *i.e.*, the Special Fund Rule, "would have been valid even if the Legislature had not set up the ... Authority, ... and even if the bonds were in fact direct obligations of the State." *Id.* at 246, 69 *A.*2d 875.

Four years later, the Court invalidated debt supported by lease-purchase agreements between the State and an independent authority. *McCutcheon, supra*, 13 *N.J.* at 65–66, 97 *A.*2d 663. *McCutcheon* involved a challenge to a statute that created a State Building Authority with the power to issue debt in order to acquire, construct, furnish, and operate office buildings for use by State entities, and to lease those facilities to the State at amounts

"sufficient ... to liquidate ... bonds" issued by the authority. *Id.* at 59, 97 *A.*2d 663. Because the State was to acquire the Authority's facilities at the end of the lease period, the Court viewed the leases as "installment purchase contracts under the guise of leases" and invalidated the entire scheme. *Id.* at 66, 97 *A.*2d 663. Justice Jacobs, with Justice Brennan, dissented. The dissent looked to "generally accepted accounting practice ... [wherein] future rentals [were not considered to be] debts or liabilities," *id.* at 70, 97 *A.*2d 663, and to the statute, which expressly stated that bonds of the Authority were not debts of the State. For those reasons, the dissent would have followed *New Jersey Turnpike Authority* and sustained the Building Authority Act. *Id.* at 73–74, 97 *A.*2d 663.

Subsequently, in an opinion written by Justice Jacobs, the Court upheld a statute authorizing the Educational Facilities Authority to issue bonds for the construction of buildings to be leased to New Jersey colleges. *Clayton, supra,* 52 *N.J.* at 157, 244 *A.*2d 281. Although it adverted to the dissent in *McCutcheon,* and to a myriad of out-of-state cases upholding the use of an independent authority for that purpose, *Clayton, supra,* 52 *N.J.* at 149–55, 244 *A.*2d 281, the Court specifically relied on the Special Fund Rule, reasoning that the annual rentals on the Authority's leases "were intended to come mainly from sources unrelated to legislative appropriations." *Id.* at 154, 244 *A.*2d 281.

Similarly, in *New Jersey Sports & Exposition Authority, supra,* the Sports Authority issued bonds to fund the construction of a sports complex in the Hackensack Meadowlands. 61 *N.J.* at 9–10, 292 *A.*2d 545. The State promised the bondholders that it would not prejudice or limit the right of the Authority to construct and operate the sports complex in any manner that would jeopardize the bondholders' interests until the bond obligations were paid, reserving revenues raised from the Authority's operations for that purpose. *Id.* at 12, 292 *A.*2d 545. The Court held that the pledge of revenues without prior voter approval did not violate the Debt Limitation Clause because the revenues were "generated by the

agency's operation ... [and would] remain a special fund for that purpose until the bonds are fully paid." *Id.* at 25, 292 *A.*2d 545.

Ten years later, in *Enourato, supra,* 90 *N.J.* at 402, 448 *A.*2d 449, the Court considered an act authorizing the Building Authority to issue up to $250,000,000 in bonds for state office building construction and operation, much like the statute challenged in *McCutcheon.* The bonds contained language explaining that the State neither was obligated to pay the debt service, nor was pledging its full faith and credit toward payment. Ibid. The Authority depended on rental receipts from lease contracts with the State that were calculated to satisfy the Authority's obligations on the bonds. Ibid. As a result, the bondholders depended on the Legislature to appropriate "sufficient money each year to pay the rental fees that are used to repay them." Ibid.

The Court determined that the Authority did not have an enforceable promise from the State that it would appropriate monies to cover the lease payments when due. *Id.* at 410, 448 *A.*2d 449. Yet, the Court acknowledged that the Building Authority Act "not only contemplates that the State will make the necessary appropriations but also seeks to ensure this result." *Ibid.* (internal citation omitted). Otherwise, the Legislature's failure "to appropriate the necessary money would not only bankrupt the Authority and force it to default on its obligations, but would also cripple the State's ability subsequently to borrow money for any purpose." *Id.* at 402–03, 448 *A.*2d 449. The Court nonetheless held that the bonds were not debts subject to the Debt Limitation Clause because the bond documents clearly stated that the State was under no legal obligation to make payment on the bonds. *Id.* at 410, 448 *A.*2d 449. In so holding, the Court "expressly overruled" *McCutcheon* and reaffirmed the principle enunciated by Chief Justice Vanderbilt in *New Jersey Turnpike Authority* that only debt the State is legally obligated to pay is subject to the requirements of the Debt Limitation Clause. *Ibid.*

Those cases stand for the proposition that the debts of an independent authority are not debts of the State under the Debt

Limitation Clause. They rely on the legal autonomy of the issuing authority and on specific language disclaiming any enforceable obligation on the part of the State. To the extent that they rely also on the availability of revenue sources for debt payments, or even recognize that revenue sources are available, the cases directly or indirectly invoke the Special Fund Rule,

> the theory of which is that the purpose of a debt limitation in a constitution is to protect the people of the state from the exercise of the taxing power to pay obligations of the state, and therefore such a constitutional provision is not impinged upon by bonds that are payable solely from the revenues of the project to be built with the proceeds of the bonds.
>
> [*N.J. Tpk. Auth., supra,* 3 *N.J.* at 246, 69 *A.*2d 875.]

The second line of cases described by the Court in *In re Loans, supra,* 124 *N.J.* at 76, 590 *A.*2d 210, holds generally that the Legislature's expression of intent to provide future funding does not create debt subject to the Debt Limitation Clause. In those cases, the Court has validated bond financing even when the expectation is that subsequent Legislatures will appropriate money to meet the debt service on the bonds. Thus, in *Holster, supra,* the Court upheld the County College Bond Act, which authorized the State and the counties to share equally in the capital costs of building community colleges using a mechanism whereby the counties would issue bonds and the State would appropriate monies to pay the principal and interest. 59 *N.J.* at 64–65, 279 *A.*2d 798. The statute explicitly provided that the bonds would not be a debt or liability of the State despite the State's expressed intention to make payments on the bonds through future appropriations. *Id.* at 65, 279 A.2d 798. The Court determined that the Debt Limitation Clause was not violated:

> Although there is doubtless a strong likelihood that payment of the bonds will in fact be met by legislative appropriations, we find nothing in the statute compelling the State to make such payments as a matter of law. Hence, both issuing counties and purchasing bondholders are on notice that the faith and credit of the State will not be pledged in respect of bonds issued pursuant to this enactment, but that payment on the part of the State will be dependent upon appropriations provided from time to time. Lacking such appropriations, recourse can be had only against the county which will have no recourse over against the State.
>
> [*Id.* at 66–67, 279 A.2d 798.]

It is a basic tenet of *Holster* that "a projected or anticipated future legislative appropriation is not a present debt or liability ... [because a] future legislature is not bound to make the appropriation." *Id.* at 71, 279 *A.*2d 798.

In *In re Loans, supra,* the Court relied on that principle. 124 *N.J.* at 77, 590 *A.*2d 210. There, the Court held that acceptance of statutorily-imposed loans from the Property Liability Insurance Guaranty Association (PLIGA) to the Automobile Insurance Guaranty Fund (Automobile Fund) did not violate the Debt Limitation Clause because "[t]he provisions ... for repayment of the PLIGA loans clearly fall within the types of assurances of future payments that this Court has traditionally found not to be 'debts.'" *Ibid.* In that case, the Automobile Fund was to repay the loans "'out of whatever monies are available ... subject to ... appropriation by the Legislature'" and after various other conditions were met. *Id.* at 72, 590 *A.*2d 210 (internal citation omitted).

The Court examined earlier cases holding that State promises to make future annual payments did not create a present debt, including *Bulman v. McCrane,* 64 *N.J.* 105, 312 *A.*2d 857 (1973) and *City of Passaic v. Consolidated Police & Firemen's Pension Fund Commission,* 18 *N.J.* 137, 113 *A.*2d 22 (1955). In *Bulman, supra,* the Court held that a twenty-five year lease arrangement under which the State would assume ownership of a building at the end of the lease did not create a present debt subject to the Debt Limitation Clause even though future rent installments would be paid out of current revenues annually appropriated. 64 *N.J.* at 117–18, 312 *A.*2d 857. Similarly, in *City of Passaic, supra,* a statute requiring the State to contribute annually to the Police and Firemen's Pension Fund was held not violative of the Clause because no present debt was created. 18 *N.J.* at 147, 113 *A.*2d 22; *see also State v. Lanza,* 27 *N.J.* 516, 525, 143 *A.*2d 571 (1958) (holding statute requiring State to pay certain municipalities amounts equal to property taxes lost after condemnation for reservoir did not violate Clause because "[t]here is no bargain or professed contractual, conventional or legal undertaking to recom-

pense the given loss of tax revenue, but rather a truly 'voluntary appropriation' for a 'lawful object' "), *appeal dismissed*, 358 *U.S.* 333, 79 *S.Ct.* 351, 3 *L.Ed.*2d 350 (1959).

Based on that case law, *In re Loans* held that the State's promise of future payments subject to appropriations does not constitute debt within the meaning of the Debt Limitation Clause. 124 *N.J.* at 77, 590 *A.*2d 210. Notably, the author of *In re Loans* later pointed out that the loan "arrangement ... was an integral part of the regulation of the insurance industry ... [and, further, that] under the arrangement, the contributions of insurers were a separate source of revenue directed to meet the claims of threatened policy holders." *Spadoro v. Whitman*, 150 *N.J.* 2, 11–12, 695 *A.*2d 654 (1997) (Handler, J., dissenting in part).

## C

Many states have employed a variety of creative and sophisticated financing devices much like those used in New Jersey to fund large capital projects. Some states also have established independent authorities charged with such duties as securing or coordinating project funding, implementing sale-leaseback agreements, and issuing bonds backed by specific revenue sources. As in New Jersey, the state courts that have reviewed those financing mechanisms in the context of debt limitation clause restrictions generally have held that they are constitutionally permissible. *See, e.g., State ex rel. Fatzer v. Armory Bd.*, 174 *Kan.* 369, 256 *P.*2d 143 (1953) (evaluating and sustaining Kansas statute that empowered Kansas Armory Board to build, establish, and maintain armories funded by revenue bonds backed solely by State rental payments); *In re Okla. Capitol Improvement Auth.*, 958 *P.*2d 759 (1988) (reviewing and sustaining Oklahoma statute authorizing Oklahoma Capital Improvement Authority to issue highway bonds secured by pre-paid user fees, direct taxes, and State Transportation Rainy Day Funds); *Baliles v. Mazur*, 224 *Va.* 462, 297 *S.E.*2d 695 (1982) (analyzing and sustaining Virginia statute under which Virginia Public Building Authority was charged with

construction, maintenance, and operation of public buildings funded by Authority-issued notes and bonds and secured by State rental payments).

Various other state courts have approved the issuance of bonds that are debt-serviced through future discretionary legislative appropriations. Again as in New Jersey, those courts have focused primarily on the discretionary nature of the state's duty to make the appropriation, and clear language in the bonds informing purchasers that the State has no legal obligation to service the bond debt through future appropriations or otherwise. *See, e.g., In re Interrogatories by the Colo. State Senate*, 193 *Colo.* 298, 566 *P.*2d 350, 355 (1977) (holding that in order for there to be state debt in the constitutional sense, "one legislature, in effect, must obligate a future legislature to appropriate funds to discharge the debt created by the first legislature"); *Wilson v. Ky. Transp. Cabinet*, 884 *S.W.*2d 641, 644 (Ky.1994) (upholding road revenue bonds because disclaimer language clearly places risk of loss on bondholders); *Dep't of Ecology v. State Fin. Comm.*, 116 *Wash.*2d 246, 804 *P.*2d 1241, 1245–46 (1991) (stating that lease and trust agreements do not violate debt limitation clause because future legislatures are not legally obligated to appropriate funds for lease payments).

State courts that have held to the contrary have criticized what they view as legislative decisions to circumvent debt limitation restrictions through the use of future discretionary appropriations that in practice are not discretionary at all. Those courts are unwilling to accept at face value declarations that the bonds issued do not constitute state debt, and instead closely examine the nature of the State's obligation. *See, e.g., Montano v. Gabaldon*, 108 *N.M.* 94, 766 *P.*2d 1328, 1330 (1989) (refusing to apply literal interpretation of debt limitation clause in holding unconstitutional county jail lease with option to purchase); *State ex rel. Ohio Funds Mgt. Bd. v. Walker*, 55 *Ohio St.*3d 1, 561 *N.E.*2d 927, 932 (finding revenue anticipation note statute "inconsistent" with debt limitation clause based on statute's practical effect, thatis, "not

only for what it purports to be, but what it actually is"), *reh'g denied*, 55 *Ohio St.*3d 722, 564 *N.E.*2d 502 (1990).

Cases from West Virginia and Wyoming are instructive as to the considerations that have informed decisions in those states. In *Winkler v. School Building Authority*, 189 *W.Va.* 748, 434 *S.E.*2d 420, 436. (1993), the West Virginia Supreme Court found that bonds issued by the State of West Virginia School Building Authority violated that state's debt limitation clause. Payment on the bonds was secured only by a legislative pledge of future appropriations. *Id.* at 425. Further, the proposed bond language expressly informed purchasers that the funds provided "'are subject to annual appropriation by the State Legislature[, which] is not legally obligated to make appropriations in amounts sufficient to pay debt service on the bonds.'" *Ibid.* (internal citation omitted).

Despite those disclaimers, the court was unwilling to "abandon ... logic and common sense" regarding the true nature of the State's obligation. *Id.* at 435. Instead, the court held that "where the only source of funds for revenue bonds is general appropriations, it defies logic to say that the Legislature has no obligation to fund such bonds." *Id.* at 433. The court distinguished the funding mechanism before it with others it had approved in the past, *e.g.*, lease-financing arrangements and special fund revenue bonds, stating as to lease financing "that state agencies have recurring needs for services, such as rental space and utility services," *id.* at 428, and, as to special fund bonds, that such bonds "are liquidated out of ... a tax or a fee generated from the facility itself, such as tolls for the use of a bridge or road, or parking-garage fees." *Id.* at 429.

In *Witzenburger v. Wyoming*, 575 *P.*2d 1100, 1120 (Wyo.1978), the Wyoming Supreme Court determined that statutorily authorized bonds issued by the Wyoming Community Development Authority violated that state's debt limitation clause. In reaching that conclusion, the court looked beyond what it described as "the legislative self-serving declaration that the bonds [were] not debts

of the state," *id.* at 1117, and instead scrutinized "the substance, not the form" of the transaction. *Ibid.* The court concluded:

> The notice on the bonds does not preclude a finding that as a matter of fact and as a matter of legislative fiat, future tax money is offered as security for and payment of revenue bonds, though reached in a round-about way. . . . The legislature cannot do indirectly what it cannot do directly.
>
> [*Ibid.* (internal citations and footnote omitted).]

Those cases suggest other approaches to the Debt Limitation Clause analysis that rely, not on a legal construct, but rather on practical considerations relating to the source of debt payments or the category of expenses funded by the debt.

## D

Two recent cases of our Court require separate and individual consideration. In one, relied on by plaintiffs, the Court issued an order with a dissent, *see Spadoro, supra,* 150 *N.J.* at 2, 695 *A.*2d 654, and in the other, relied on by the State, there is a discussion of a pre-EFCFA financing proposal for the construction of school facilities in the Abbott Districts. *See Abbott V, supra,* 153 *N.J.* at 523–24, 710 *A.*2d 450.

*Spadoro* involved a challenge to the Pension Bond Financing Act of 1997, *N.J.S.A.* 34:1B–7.45 to –21, in which the plaintiffs alleged that by establishing a mechanism for the creation of state debt without voter approval, the Act violated various provisions of the State Constitution, including the Debt Limitation Clause. *Spadoro, supra,* 150 *N.J.* at 2, 695 *A.*2d 654. Under the Pension Bond Financing Act, the EDA is authorized to issue approximately $2.7 billion in state contract bonds "to pay the State's obligations for the unfunded accrued liability of several state pension systems." *Ibid.* (Handler, J., dissenting in part). Payment on the bonds is to come from the State, "subject to future legislative appropriations." *Ibid.* A majority of the Court found that the matter was moot and entered an order dismissing the plaintiff's

*appeal and petition for certification.*[6] Ibid. *Justice Handler filed an opinion, joined by Justice Stein, concurring in part and dissenting in part. He believed the Court should adjudicate the case "because of the importance of the underlying issue and the possibility of its recurrence."* Id. *at 3, 695 A.2d 654.*

As in *In re Loans, supra,* Justice Handler reviewed our prior case law, but, on reevaluation of the State's bonding practices, he suggested a three part test that would consider whether the bonds "are created by an independent authority," are "dependent on a 'special fund' or separate revenue source for . . . repayment," and are dependent on a "pledge on the part of the state to repay the debt." *Id.* at 8–9, 695 *A.2d* 654. Using that formulation, the dissent concluded that the EDA was not an independent authority because it "serve[d] no governmental function other than to issue the bonds for the State itself, becoming, in effect, a shield to insulate the State from being labeled a debtor." *Id.* at 10, 695 *A.2d* 654. Moreover, under the second prong of the test, the EDA had "no separate source of income . . . [that would] enable [it] to repay the bonds." *Ibid.*

Finally, the dissent expressed particular concern that the proceeds were to be used to offset "the ordinary expenses entailed in the regular operation of government." *Ibid.* Justice Handler observed that prior bond acts validated by the Court "involved government purposes, such as major capital improvements, capital construction and the provision of special services," and not the day-to-day costs of operating State government. *Ibid.* He did not discuss the third prong of his test—whether the State had pledged repayment on the debt—but, rather, relied principally on the lack of both a "separate source of income . . . to repay the bonds," and a fully functioning authority as support for his view that the Pension Bond Financing Act violated the Debt Limitation Clause.

---

[6] The Pension Bond Financing Act was dismissed as moot because "the bonds . . . were sold before the Court had an opportunity . . . to hear the appeal on the merits." *Id.* at 14, 695 *A.2d* 654.

*Id.* at 11, 12, 695 *A*.2d 654. In the instant case, plaintiffs rely on Justice Handler's dissent as "persuasive authority" and urge the Court to adopt his reasoning.

In *Abbott V, supra,* the Court approved the State's proposal to use contract bonds to finance the construction and repair of school facilities. 153 *N.J.* at 524, 710 *A.*2d 450. During the remand proceedings ordered in *Abbott v. Burke,* 149 *N.J.* 145, 223–26, 693 *A.*2d 417 (1997) (*Abbott IV*), the State had proposed that the Abbott districts issue bonds through a "private placement" with a state agency, the Educational Facilities Authority (EFA), "which would, in turn sell [the bonds] to the public." *Abbott V, supra,* 153 *N.J.* at 523, 710 *A.*2d 450. More specifically, concerned that property-poor districts with low bond ratings faced difficulties securing school construction financing, the Department of Education "recommended that the Legislature amend *N.J.S.A.* 18A:72A–1 to –58 to empower the ... EFA ... to finance the construction and renovation of elementary and secondary schools in the Abbott districts." *Abbott V, supra,* 153 *N.J.* at 523, 710 *A.*2d 450. As the remand court observed, "[b]ecause they are property-poor, Abbott districts have great difficulty issuing bonds in the open market; even if they could go to the bond market, the bonds would carry a substandard rating and high interest rate." *Id.* at 631, 710 *A.*2d 450 (App. I) (Report and Decision of Remand Court). In contrast, it was anticipated that the proposed EFA bonds would receive an AAA rating, and that the districts would obtain other benefits from the arrangement because, as "construction manager" the EFA "would prepare specifications for construction, solicit bids for all work and materials required, enter into project contracts, invest any monies not required for immediate disbursement, and review all completed work before dispensing requisitioned funds." *Id.* at 523–24, 710 *A.*2d 450.

The Court found that the State's proposal "would ensure efficient and satisfactory construction" and "would effectively address the need for adequate facilities and capital improvements" in the Abbott districts. *Id.* at 524, 710 *A.*2d 450. As the *Abbott* plain-

tiffs, *amici* in this case, correctly point out, in *Abbott V* the Court "accepted the State's preliminary proposal to fully finance needed construction through the issuance of contract bonds by EFA."

## III

Plaintiffs center their more general argument on EFCFA as illustrative of the class of statutes that authorize unconstitutional debt. The more focused discussion of EFCFA by the parties and by various *amici*, as well as the Act's unique underpinning in the Education Provision of our Constitution, permit disposition of the EFCFA claim.

## A

EFCFA establishes the largest, most comprehensive school construction program in the nation. See *N.J.S.A.* 18A:7G–1 to – 30; *id.* at –57 to –71; New Jersey Department of Education, *Summary of the Educational Facilities Construction & Financing Act, at* http://www.state.nj.us/njded/facilities/act_summ.htm. Consonant with the constitutional mandate of the Education Provision, the Act was passed "to provide for the maintenance and support of a thorough and efficient system of free public schools," including educating children in "physical facilities that are safe, healthy, and conducive to learning." *N.J.S.A.* 18A:7G–2a. In furtherance of that responsibility, EFCFA addresses "[i]nadequacies in the quality, utility, and safety of educational facilities [that] have arisen among local school districts of this State," *id.* at –2b, most particularly, in the Abbott Districts:

> Educational infrastructure inadequacies are greatest in the Abbott districts where maintenance has been deferred and new construction has not been initiated due to concerns about cost. To remedy the facilities inadequacies of the Abbott districts, the State must promptly engage in a facilities needs assessment and fund the entire cost of repairing, renovating, and constructing the new school facilities determined by the Commissioner of Education to be required to meet the school facilities efficiency standards in the Abbott districts. In other districts, the State must also identify need in view of anticipated growth in school population, and must contribute to the cost of the renovation and construction of new facilities to ensure the provision of a thorough and efficient education in those districts.

[*Id.* at –2c.]

To effectuate its goals, the Act states that the EDA, established pursuant to *N.J.S.A.* 34:1B–1 to –21.15, "shall be responsible for the financing, planning, design, construction management, acquisition, construction, and completion of school facilities projects." *N.J.S.A.* 18A:7G–13a. EFCFA authorizes the EDA "to issue bonds and refunding bonds, incur indebtedness and borrow money" to fund those projects and to provide for the administrative and operating costs of the Authority in connection with its school construction activities. *Id.* at –14a.

The financing scheme for the payment of the debt service on the bonds involves the use of contract bonds. *Id.* at –17 and –18. The Act permits the EDA and the State Treasurer to enter into a contract wherein the Treasurer agrees to pay from the General Fund to the EDA "an amount equal to the debt service amount due to be paid in the State fiscal year on the bonds or refunding bonds" issued by the Authority. *Id.* at –17; see *id.* at 14c. Those bonds, however, are issued subject to a proviso in the authorizing legislation, and in the bonds, that payment is contingent on annual appropriations by the Legislature and that the bonds are not the debt of the State. See *id.* at 14f, –17, and –18.

Pursuant to *N.J.S.A.* 18A:7G–14a, the Authority is permitted to issue no more than $8.6 billion in bonds for the purpose of funding new schools and repairing existing facilities. Of that $8.6 billion, $6 billion is allocated to the Abbott districts to fully fund school facilities projects, and $2.5 billion to non-Abbott school projects.[7] *Ibid.* As of May 2001, one-half billion dollars in bonds had been sold. *Lonegan, supra,* 341 *N.J.Super.* at 483, 775 *A.*2d 586 (Wells, J.A.D., dissenting). The question whether EFCFA bonds should be issued has not been and will not be put to the voters.

---

[7] One hundred million dollars is designated "for the State share of costs for county vocational school district facilities projects." *N.J.S.A.* 18A:7G–14a.

## B

The contract debt authorized by EFCFA is *sui generis*. We are unaware of any other authorized state bonds dedicated to the provision of constitutionally required facilities. Indeed, in the purpose provisions of EFCFA the Legislature specifically acknowledges its constitutional obligation under the Education Provision to provide safe and adequate school buildings in every school district in the State. See *N.J.S.A.* 18A:7G–2a to –2c. In *Abbott V, supra,* we recognized

> that the school buildings in Abbott districts are crumbling and obsolescent and that this grave state of disrepair not only prevents children from receiving a thorough and efficient education, but also threatens their health and safety. Windows, cracked and off their runners, do not open; broken lighting fixtures dangle precipitously from the ceilings; fire alarms and fire detection systems fail to meet even minimum safety code standards; rooms are heated by boilers that have exceeded their critical life expectancies and are fueled by leaking pumps; electrical connections are frayed; floors are buckled and dotted with falling plaster; sinks are inoperable; toilet partitions are broken and teetering; and water leaks through patchwork roofs into rooms with deteriorating electrical insulation.
>
> [153 *N.J.* at 519, 710 *A.*2d 450.]

Because "[t]hese deplorable conditions have a direct and deleterious impact on the education available to ... at-risk children," we held that "[t]he State's constitutional educational obligation includes the provision of adequate school facilities." *Ibid.*

That mandate is reinforced in our Constitution by Article VIII, Section IV, paragraph 2 (the School Fund Provision), wherein a perpetual "fund for the support of free public schools" is established. That provision states, in relevant part:

> The bonds of any school district of this State, issued according to law, shall be proper and secure investments for the said fund and, in addition, said fund, including the income therefrom and any other moneys duly appropriated to the support of free public schools may be used in such manner as the Legislature may provide by law to secure the payment of the principal of or interest on bonds or notes issued for school purposes by counties, municipalities or school districts or for the payment or purchases of any such bonds or notes or any claims for interest thereon.
>
> [art. VIII, § IV, ¶ 2.]

By its express terms, the provision permits the State to use the school fund and "income therefrom *and any other moneys duly*

*appropriated to the support of free public schools,* as the Legislature so chooses, to guarantee the school bonds of counties, municipalities or school districts." *Ibid.* (emphasis added). Approved in 1958 by the voters, the School Fund Provision separately authorizes state-backed school bonds without reference to the Debt Limitation Clause. Although there is little extant legislative history on the provision, a May 1958 Statement of the State Federation of District Boards of Education of New Jersey before the Education Committee of the Assembly outlines the simple purpose behind its enactment—to enable the State to support school bonds.

By allowing the State to guarantee local debt, the School Fund Provision advances the constitutional guarantee of a thorough and efficient education. In practical effect, as noted in *Abbott V, supra,* state support allows school districts to obtain more favorable interest rates for their bonds thereby lowering the costs of school construction. 153 *N.J.* at 523, 710 *A.*2d 450. Indeed, the bond strategy approved in *Abbott V* appears to follow closely the structure permitted by the School Fund Provision. As originally proposed in the *Abbott IV* remand hearings, *Abbott V, supra,* 153 *N.J.* at 630–32, 710 *A.*2d 450 (App. I), and as approved by the Court in *Abbott V,* a State authority would have purchased local debt and then sold that debt to the public. *Id.* at 524, 710 *A.*2d 450. We can see little difference between the tiered financing approach originally proposed and the simpler design found in EFCFA. Certainly, debt issued by the EDA effectuates the core purpose of the School Fund Provision by providing state support for constitutionally required school construction bonds.[8]

It is not surprising, then, that the State relied on our approval in *Abbott V* when enacting EFCFA. Moreover, both the executive

---

[8] We note, also, that we have previously affirmed the power of the Commissioner of Education to direct the issuance of bonds by a local school district to pay for necessary school repairs even when the voters have not approved the bonds. *In re Upper Freehold Reg'l Sch. Dist.,* 86 *N.J.* 265, 281, 430 *A.*2d 905 (1981).

and legislative branches had good reason to believe that, under the precedents of this Court, EFCFA would withstand a Debt Limitation Clause challenge. EFCFA bonds are a classic example of non-binding debt. The bonds themselves contain explicit language to the effect that they are not backed by the State's full faith and credit. Also, the bonds, the contract between the State Treasurer and the EDA, and documents accompanying the bonds and the contract, all clearly indicate that the bonds are the "limited obligations of the EDA" and "shall not be a debt or liability of the State." *N.J.S.A.* 18A:7G–14f; see *N.J.S.A.* 18A:7G–14c, –17, and – 18. In this respect the bonds are similar to the debt approved by the Court in its earlier cases.

Finally, in its details, EFCFA tracks those mechanisms that have been previously endorsed by this Court. In conformance with our case law, substantial power is placed in the hands of an independent authority to carry out a wide range of activities related to the construction and improvement of school buildings. *N.J.S.A.* 18A:7G–13. That authority—the EDA—has broad powers to oversee the financing and construction of facilities adequate to meet the mandate of a thorough and efficient education for the school children of this State. *Id.* at –5; see *Abbott V, supra,* 153 *N.J.* at 519–20, 710 *A.*2d 450.

In its broad outline, EFCFA was approved by this Court in *Abbott V.* In reliance on that approval and on our long line of precedents validating similar debt issued by an independent authority, the State sought to fulfill its constitutional obligation to the school children of New Jersey. For that reason, and because EFCFA is based in the Education Provision and supported by the School Fund Provision of our Constitution, we hold that the Act does not violate the Debt Limitation Clause of the New Jersey Constitution.

## IV

Over five decades of case law in New Jersey have established the constitutionality of contract debt in a variety of forms and settings. Distilled to its essence, our cases have held that when

the bonds authorized do not impose a legal obligation on the State they are not a debt of the State. *See N.J. Tpk. Auth., supra,* 3 *N.J.* at 242, 69 *A.*2d 875 ("To bring the proposed bond issue under the ban of the Constitution it must first appear that the bonds will 'create ... a debt or debts, liability or liabilities of the State.'"). Yet, in this case, plaintiffs question the continued viability of that concept.

In his *Spadoro* dissent, Justice Handler concluded from his review of the Pension Bond Financing Act that "[i]f the State is permitted to incur debt in order to meet current operating expenses, payable only from the State's general revenues, it is hard to imagine any debt issuance by a state agency that would run afoul of the Debt Limitation Clause." 150 *N.J.* at 12, 695 *A.*2d 654. Concerned about the various devices now used to avoid "the restrictions of the ... Clause," *ibid.,* he adjured the Court to revisit its "fundamental" meaning:

> In evaluating the validity of the bond issue under the Debt Limitation Clause, we are enjoined to accord that provision the status that it deserves, namely, that of an important structural provision in our Constitution. Its essential purpose is central to the constitutional structure of government. Its broad and fundamentally important purpose of not binding future majorities to the financial policies of current majorities must be construed with that overriding constitutional theme in mind. Under no circumstance should it be deflated or read out of the Constitution as a mere nuisance provision that serves no purpose except to define an administrative procedure for selling debt.
>
> [*Id.* at 12–13, 695 *A.*2d 654.]

When, in 1953, Justices Jacobs and Brennan dissented in *McCutcheon,* Justice Jacobs wrote:

> In authorizing and executing the actual leases in controversy before us the Legislative and Executive Branches have simply applied sound and economical current business practices without incurring any new state bonded indebtedness or imposing any new taxes, without endangering the State's credit and without violating any restrictive constitutional policies expressed by the delegates.
>
> [13 *N.J.* at 78, 97 *A.*2d 663.]

Justice Jacob's caveat is a telling reminder of the concerns that brought about the Debt Limitation Clause in the 1800s. Today, it appears likely that the "State's credit" would be "endanger[ed]" if the Legislature declined to appropriate monies sufficient to cover payments on the contract debt it has authorized.

The Debt Limitation Clause became a part of our State Constitution because New Jersey wished to avoid speculation through debt financing by limiting its use. The economic conditions that led to the Clause, particularly the amount of debt accumulated by many of the states, brought about "the financial collapse of several ... [s]tate governments." Dewey, *supra*, at 243. One historian describes those conditions as follows:

> Encouraged by the expansion of industry and commercial enterprise which was witnessed in this country during the first half of the century, many States, particularly in the North, borrowed money to invest in internal improvements, such as railroads and canals, which would aid in developing their resources; in the South, and in a less degree the West, States borrowed largely in order to engage in State banking schemes, and in the West States borrowed for commercial enterprises. These undertakings in many cases proved either unremunerative or too expensive for the State to carry; and in some of the newer commonwealths particularly there was not an honest determination, even where there was the ability, to meet the maturing obligations of interest and principal.
>
> [*Id.* at 243–44.]

The framers believed that future generations of taxpayers should not have to pay for their generation's mistakes.

Perhaps because of that history, other state courts have taken a more expansive view of debt limitation clauses like ours. *See supra* at 450–55, 809 *A.2d* at 99–101. We, also, have considered other means to evaluate whether a statute authorizing the issuance of contract debt violates the Debt Limitation Clause, including whether payment on the bonds is derived from an independent revenue source such that future appropriations from general tax revenues will not be required, or whether the authorized lease/debt payments are for necessary state office space rather than some speculative venture.

■ Those different approaches provide a useful framework for analysis. We therefore direct the Clerk of the Court to establish a schedule for additional briefing and reargument in the fall. Plaintiffs should center their discussion on the financing mechanisms authorized by the statutes they find objectionable and on those different categories of contract debt reviewed in the case law of this and other states. We ask the parties to assume in

their presentations that the Court intends to reconsider its precedents sustaining contract debt (or debt subject to future appropriations), and to present argument related to those other approaches.

Thus, for example, the parties should discuss whether the purposes of the Debt Limitation Clause are served when the debt authorized is backed by a revenue stream. Is it sufficient, for purposes of the analysis, that the revenue is realistically "anticipated" at the time the enabling statute is enacted or should that revenue be considered at the time of debt issuance? And, must that revenue be derived from the project financed (self-liquidating), *e.g.,* turnpike tolls, college tuition, or can it be from another source (the Special Fund Doctrine, *see supra* at 446–450, 809 *A.2d* at 96–98)? Are lease payments structured to cover the debt service on bonds issued to construct state office buildings a violation of the Debt Limitation Clause? Must the payments reflect fair market value rentals? Would it affect the analysis if the lease is a typical lease containing terms and conditions generally found in commercial leases? Although such payments resemble the "ordinary expenses of government" that concerned the *Spadoro* dissent, can they/should they be differentiated from pension contributions? We invite the parties to present other relevant considerations based on our dissenting colleague's view of those matters, or based on the parties' understanding of the financial markets and state bonding practices.

Finally, although we do not here dispose of any of these matters, or suggest any particular result, we ask the parties to discuss whether, as suggested by the dissent, the Court's decision should be given a future effective date if any of the State's bonding practices are invalidated under the Debt Limitation Clause.

## V

The judgment of the Appellate Division upholding EFCFA is affirmed. Plaintiffs' general challenge to contract debt is set down for reargument.

STEIN, J., concurring in part and dissenting in part.

The critical issue in this appeal is whether the issuance of so-called "contract" or "appropriations" debt without voter approval by independent state authorities, unsupported by an adequate independent revenue source and to be amortized by annual legislative appropriations, violates the Constitution's Debt Limitations Clause, *N.J. Const.* Art. VIII, § 2, ¶ 3,[9] notwithstanding that the State has no legal liability for repayment of that debt.

The State's increased reliance on appropriations debt in recent years is undisputed. That debt now amounts to approximately $10.8 billion, or roughly seventy-five percent of the State's total bonded debt. Also undisputed is that the State never has defaulted and, as a practical matter, cannot default on its appropriations debt, and that the credit markets and bond rating agencies regard appropriations debt as substantially equivalent to general obligation debt because "a failure to appropriate will result in a significant credit deterioration for all types of debt issued by the defaulting government." Standard & Poors, Revised Lease and Appropriation Backed Debt Rating Criteria (June 13, 2001) (S & P Rating Criteria).

The State does not dispute that the classic description of the purpose of the Debt Limitation Clause is that it prohibits " 'one

---

[9] In relevant part, that clause provides:

The Legislature shall not, in any manner, create in any fiscal year a debt or debts, liability or liabilities of the State, which together with any previous debt or liabilities shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law for some single object or work distinctly specified therein.... [S]uch law shall provide the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal thereof within thirty-five years from the time it is contracted; and the law shall not be repealed until such debt or liability and the interest thereon are fully paid and discharged.

Except as hereinafter provided, no such law shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon.

Legislature from incurring debts [that] subsequent Legislatures would be obligated to pay, without prior approval by public referendum.'" *City of Camden v. Byrne*, 82 *N.J.* 133, 152, 411 *A.*2d 462 (1980) (quoting *New Jersey Sports & Exposition Auth. v. McCrane*, 61 *N.J.* 1, 13–14, 292 *A.*2d 545 (1972)).

The State contends that, even though as a practical matter the Legislature annually must appropriate amounts necessary for debt service on appropriations bonds, the Debt Limitations Clause is not implicated because "the bond holders may not compel the State to make principal and interest payments on the independent authorities' bonds." In my view, the State's analysis effectively would write the Debt Limitations Clause out of the Constitution and render it a nullity. That analysis implies that the State can ignore the voter approval requirement of the Debt Limitation Clause and borrow money at almost the same interest rate available for general obligation bonds by the simple expedient of substituting an independent state authority as the borrower in place of the State, even though annual state appropriations are the primary or exclusive source of funds to amortize the debt.

The Court's opinion upholds the validity of bonds to finance school construction and renovation authorized by the Education Facilities Construction and Financing Act (EFCFA or the Act), *N.J.S.A.* 18A:7G–1 to –44, a determination in which I concur. The Court elects, however, to reargue rather than decide the critical issue of the validity of contract or appropriations debt, an issue that in my view should be decided now and not deferred. The public interest clearly requires this Court to resolve the question of the constitutionality of appropriations debt. Reargument will delay—but not illuminate—that determination.

I would hold that the issuance of debt without voter approval by an independent state authority, unsupported by an adequate independent revenue source and to be amortized primarily or exclusively by annual legislative appropriations, violates the Debt Limitation Clause notwithstanding that the State has no legal liability for repayment of the debt. No one disagrees that the State, as a

practical matter, must repay its appropriations debt in order to maintain the stability of its credit in the bond market. As a result, appropriations debt effectively commits future legislatures to authorize appropriations for debt repayment without voter approval—notwithstanding that the State has no *legal* liability for such debt—in contravention of the purpose and intent of the Debt Limitation Clause.

In assuming that appropriations debt issued without voter approval and unsupported by an independent revenue source did not offend the Constitution, the legislative and executive branches obviously have relied heavily on past decisions of this Court. Whether or not the extent of that reliance was wholly justified may be debatable, but the reliance itself is incontestable. The Attorney General's brief states that

> over a period of more than fifty years, this Court has repeatedly recognized that bonds issued by independent authorities, without the State's full faith and credit, and backed only by a promise from the State Treasurer to make payments if future Legislatures decide to make appropriations for such payments, do not constitute State debt for constitutional purposes.

That brief also asserts that the Legislature enacted EFCFA in part as a response to this Court's decision in *Abbott v. Burke*, 153 *N.J.* 480, 710 *A.*2d 450 (1998) (*Abbott V*), and various *amici* point to portions of that opinion that fairly could be read as endorsing essentially the same bond financing mechanism for school construction that was incorporated in the Act. *Id.* at 525–26, 710 *A.*2d 450. Moreover, in excess of fifty school districts have put school construction bond issues on the ballot in reliance on the Act, with a success rate of over eighty percent.

Moreover, as I explain, *infra* at 498–500, 809 *A.*2d at 131–32, I also am concerned that the Debt Limitation Clause may no longer be the most relevant contemporary standard for determining whether the issuance of additional State debt is economically sound. I note that the bond rating agencies consider the ratio of debt service to annual revenues to be a more accurate gauge of a State's capacity to carry additional debt. Accordingly, I consider it to be likely that a decision invalidating appropriations debt

would prompt the Legislature to give serious and expeditious consideration to the feasibility of a constitutional amendment relating to the issuance of appropriations debt.

As I later demonstrate in more detail, *infra* at 501–06, 809 *A.2d* at 133–36, in determining whether the remedy for a judicial invalidation of a state statute on constitutional grounds should apply retroactively or prospectively, " 'reliance interests weigh heavily in the shaping of an appropriate equitable remedy.' " *Salorio v. Glaser*, 93 *N.J.* 447, 464, 461 *A.2d* 1100 (1983) (quoting *Lemon v. Kurtzman* (Lemon II), 411 *U.S.* 192, 203, 93 *S.Ct.* 1463, 1471, 36 *L.Ed.*2d 151, 163 (1973)). Because of the longstanding and widespread reliance by the legislative and executive branches of State government on this Court's prior decisions on this issue over the past fifty years, specifically including *Abbott V*, I am persuaded that a holding that the issuance of appropriations debt without voter approval by an independent state authority, unsupported by an adequate independent revenue source and to be amortized by annual legislative appropriations, violates the Debt Limitation Clause, should apply only prospectively, effective January 1, 2004, in order to afford the Legislature time to take appropriate steps, including possible approval of a constitutional amendment for submission to the voters, to preserve the State's access to financial markets.

I

Plaintiffs challenge the constitutionality of contract bond financing in a complaint seeking injunctive relief and a declaratory judgment that the EFCFA, and various other statutes that authorize contract bond financing, violate the Debt Limitation Clause. In addition to the State and its Treasurer, the defendants include the New Jersey Educational Facilities Authority (EFA), the Economic Development Authority (EDA), the New Jersey Transportation Trust Fund Authority (TFA), and the New Jersey Sports and Exposition Authority (Sports Authority), all of which are independent Authorities with the statutory power to issue contract debt. The Law Division granted summary judgment in favor of

all defendants, concluding that the EFCFA and other statutes authorizing contract bond financing did not violate the Constitution. A divided panel of the Appellate Division affirmed. *Lonegan v. State,* 341 *N.J.Super.* 465, 775 *A.*2d 586 (2001). The dissenting member concluded that contract bond financing was unconstitutional, noting that it "ignores the spirit of the entire [Debt Limitation] Clause," and "ignores the letter of the first line of the Clause [that prohibits] creating debt 'in any manner' in violation of the Clause." *Id.* at 488, 775 *A.*2d 586 (Wells, J., dissenting). Judge Wells would have remanded the matter to the trial court to grant injunctive relief. *Ibid.*

Although plaintiffs' appeal implicates its challenge to the constitutionality of numerous statutes that authorize contract bond financing, the challenge to the contract bond financing provisions of the EFCFA is central to this appeal and perhaps best illustrates the rationale for prospective application of my determination that contract bond financing unsupported by an independent revenue source and amortized by annual legislative appropriations violates the Debt Limitation Clause.

The EFCFA was enacted "to provide for the maintenance and support of a thorough and efficient system of free public schools[, including educating children] in physical facilities that are safe, healthy, and conducive to learning." *N.J.S.A.* 18A:7G–2a. In furtherance of that responsibility, EFCFA addresses "[i]nadequacies in the quality, utility, and safety of educational facilities [that] have arisen among local school districts of this State," *id.* at –2b, most particularly, in the Abbott Districts.

The Act provides that the EDA, established pursuant to *N.J.S.A.* 34:1B–1 to –21.15, "shall be responsible for the financing, planning, design, construction management, acquisition, construction and completion of school facilities projects." *N.J.S.A.* 18A:7G–13a. EFCFA authorizes the EDA "to issue bonds and refunding bonds, incur indebtedness, and borrow money" to fund those projects and to provide for the administrative and operating

costs of the Authority in connection with its school construction activities. *N.J.S.A.* 18A:7G–14a.

The financing scheme for the payment of the debt service on the bonds involves the use of contract or appropriation bonds. *N.J.S.A.* 18A:7G–17 and –18. The Act authorizes the EDA and the State Treasurer to enter into an agreement pursuant to which the Treasurer agrees to pay from the General Fund to the EDA "an amount equal to the debt service amount due to be paid in the State fiscal year on the bonds or refunding bonds" issued by the Authority. *N.J.S.A.* 18A:7G–17. See *N.J.S.A.* 18A:7G–14c. Those bonds are "special and limited obligations of the authority," not the State, and must "contain a statement to that effect on their face." *N.J.S.A.* 18A:7G–14f. Accordingly, any contractual commitment made by the Treasurer regarding payments from the general fund to meet the debt service on the bonds is "subject to and dependent upon" annual appropriations by the Legislature. *N.J.S.A.* 18A:7G–17, –18.

A distinguishing feature of school facilities construction to be financed by the appropriations debt authorized by EFCFA is that the need for those school facilities in the so-called *Abbott* districts has been determined by this Court to be a matter of constitutional mandate. In *Abbott v. Burke,* 149 *N.J.* 145, 693 *A.2d* 417 (1997) (*Abbott IV*), this Court held that the Comprehensive Educational Improvement and Financing Act (CEIFA), *N.J.S.A.* 18A:7F–1 to –36, was unconstitutional as applied to the Abbott districts in several respects including its failure "to address one of the most significant problems facing the [Special Needs Districts (SND's)] dilapidated, unsafe, and overcrowded facilities." *Id.* at 186, 693 *A.2d* 417.

We observed:

> The statute neglects to consider the dire need for facilities improvement. Amicus points out that that omission contributes to the inadequacy of the statute as a remedial measure and renders it unconstitutional. Contrary to the argument of the State, the condition of school facilities always has been of constitutional import. Deteriorating physical facilities relate to the State's educational obligation, and we continually have noted that adequate physical facilities are an

essential component of that constitutional mandate. *See Abbott II, supra,* 119 N.J. at 362, 575 A.2d 359 ("A thorough and efficient education also requires adequate physical facilities."); *Robinson I, supra,* 62 N.J. at 520, 303 A.2d 273 ("We have discussed the existing scene in terms of current operating expenses. The State's obligation includes as well the capital expenditures without which the required educational opportunity could not be provided."); *see also N.J.S.A.* 18A:7A–5(f) (repealed) (stating that one part of a thorough and efficient education requires "[a]dequately equipped, sanitary and secure facilities").

Many school buildings in the special needs districts are in dramatic disrepair. . . . The accounts of crumbling and obsolescent schools inundate the record. Forty-nine public-school buildings in the State are one-hundred years of age or older. Seventy-three percent of those century-old buildings are located in SNDs. Furthermore, forty-one percent of the total number of school buildings statewide are over fifty years old. In the SNDs, sixty-four percent of the buildings are over fifty years old.

. . . .

In 1994, the Governor's Education Funding Review Commission (the Commission) found that "[f]acilities improvement is a critical issue which must be addressed if educational improvement is to be achieved within the special needs districts." *Education Funding Review Commission, Financing New Jersey's Public Schools* 16 (July 1994). The Commission recommended that the DOE conduct a study to determine the most appropriate financing method to "address the unmet physical facilities needs of school districts." It does not appear that any such study has been conducted, and CEIFA fails to address the estimated "$6 billion facilities needs for New Jersey's public schools." Such a failure is of constitutional significance—we cannot expect disadvantaged children to achieve when they are relegated to buildings that are unsafe and often incapable of housing the very programs needed to educate them.

The State must, as part of its obligation under the education clause, provide facilities for children in the special needs districts that will be sufficient to enable those students to achieve the substantive standards that now define a thorough and efficient education.

[*Id.* at 186–88, 693 A.2d 417 (footnotes omitted) (citations omitted).]

To remedy those deficiencies, the Court, as part of its *Abbott IV* order remanding the matter to the Law Division, mandated that the Commissioner of Education assess the facilities needs of the Abbott districts and make recommendations for addressing those needs, *id.* at 225, 693 A.2d 417, observing that the adequacy of facilities in Abbott districts could not "depend on the districts' willingness or ability to raise taxes or to incur debt[.]" *Id.* at 188, 693 A.2d 417.

In response to the Court's order, the Department of Education (DOE) completed an engineering study that addressed not only deficiencies in existing school facilities in all Abbott districts but in addition the need for new construction. The DOE's long-term facilities plan contemplated preparation by each Abbott district of a Facilities Management Plan to be submitted to and approved by DOE.

The DOE submitted a proposal to the remand court to finance renovations and new facilities construction in the Abbott districts through bonds issued by the New Jersey Educational Facilities Authority (EFA) and to be repaid by annual State appropriations. The DOE's specific funding proposal contemplated that each Abbott district privately would issue bonds payable to the EFA in an amount equal to the cost of implementing that district's approved facilities plan. The EFA would then sell its bonds in a public offering, without voter approval, in an amount equal to the aggregate cost of facilities construction for all Abbott districts, with repayment to be financed by annual State appropriations. The remand court noted that "EFA bonds are rated slightly lower than State general obligation bonds, resulting in a higher interest rate of only .1 or .2%." *Abbott V, supra,* 153 *N.J.* at 631–32, 710 *A.2d* 450 (App. 1). After reviewing the DOE's proposal to finance renovation and construction of facilities in the Abbott districts, this Court expressed its approval of the funding plan:

> In the past, property-poor districts that had a poor bond rating were unable to finance needed construction. Recognizing this, the DOE has recommended that the Legislature amend *N.J.S.A.* 18A:72A–1 to –58 to empower the Educational Facility Authority (EFA or Authority) to finance the construction and renovation of elementary and secondary schools in the Abbott districts. Under the proposed plan, a district would issue bonds in an amount consistent with its facilities needs as expressed in its Plan. The district would then sell these bonds privately to the Authority, which would, in turn, sell them to the public. The Authority's bonds would receive a triple "A" rating, and the debt would be serviced using annual appropriations from the State. Because EFA-issued bonds are viewed in the market as one notch less than a general obligation of the State, there would be significant repercussions to the State and its credit rating were the Legislature not to make an annual appropriation.
>
> Besides allowing districts with poor credit to finance their construction through indirect market participation, this arrangement has other benefits. The EFA

would serve as construction manager for all projects. The Authority would prepare specifications for construction, solicit bids for all work and materials required, enter into project contracts, invest any monies not required for immediate disbursement, and review all completed work before dispensing requisitioned funds. In short, the EFA would ensure efficient and satisfactory construction. *We determine that the State's proposal to provide and administer the funding for capital improvements would effectively address the need for adequate facilities and capital improvements.*

[153 *N.J.* at 523–24, 710 *A.*2d 450 (citation omitted)(emphasis added).]

We also emphasized the constitutional underpinning for our mandate that the State fully fund all costs of remediating facility and capacity deficiencies in the Abbott districts:

We conclude that any funding formula that does not fund the complete cost of remediating the infrastructure and life cycle deficiencies that have been identified in the Abbott districts or that does not fully fund the construction of any new classrooms needed to correct capacity deficiencies will not comport with the State's constitutional mandate to provide facilities adequate to ensure a thorough and efficient education.

[153 *N.J.* at 524, 710 *A.*2d 450.]

The recognition in both *Abbott IV* and *Abbott V* that the constitutional mandate of a thorough and efficient education also encompassed the need for adequate educational facilities echoed earlier decisions by this Court to the same effect. In *In re Upper Freehold Regional School District,* 86 *N.J.* 265, 430 *A.*2d 905 (1981), we upheld an order by the Commissioner of Education mandating that a school district issue bonds to finance essential structural repairs to the roof of a regional high school building despite prior rejection of the project on two occasions by voters in the school district. In concluding that the absence of voter approval did not preclude the Commissioner from ordering the district to issue bonds to finance the critically needed repairs, we stated:

We recognize that the traditional and preferred method for obtaining necessary approval of bonds for a capital project in a Type II district is to obtain voter approval. In this case, however, in spite of the critical situation faced by the local board, the voters twice rejected referenda seeking approval of the issuance of the bonds. Although the Legislature has provided that voters of a school district may authorize the issuance of bonds, the Legislature has not specified that voter approval is the only acceptable method. The lack of any such restriction should be assessed in light of the constitutional mandate and statutory provisions for a

thorough and efficient education. We conclude that, after voter rejection, the Commissioner may authorize the issuance of bonds for a capital project for a public school.

[86 *N.J.* at 279, 430 *A.*2d 905.]

*See also Bd. of Educ. of Elizabeth v. City Council of Elizabeth,* 55 *N.J.* 501, 506, 262 *A.*2d 881 (1970) ("Thus it is the duty of the Commissioner to see to it that every district provides a thorough and efficient school system. This necessarily includes adequate physical facilities and educational materials, proper curriculum and staff and sufficient funds.").

In addition to the Legislature's obvious reliance on this Court's apparent approval in *Abbott V* of the essential elements of the capital funding mechanism adopted by the Act, the record informs us that over fifty school districts throughout the State have relied on the Act by seeking voter approval for capital financing of construction projects eligible for financing under the EFCFA, with a success rate of over eighty percent. Moreover, all of the Abbott districts have submitted and received approval of their Long Range Facilities Plans as required by the Act. The conclusion is inescapable that both the Legislature and the affected school districts have relied on the constitutional mandate for adequate school facilities and this Court's Abbott decisions in the enactment of EFCFA and in the planning and approval process for the proposed renovation and construction of school facilities.

II

In addition to its reliance on our decisions in *Abbott IV* and *Abbott V* in adopting the financing mechanism contained in the EFCFA, the Legislature and the Attorney General apparently have relied on a series of prior decisions by this Court to support their assumption that the issuance of any debt by a state authority without voter approval, that the State is not legally obligated to repay, does not violate the Debt Limitation Clause. A careful analysis of those decisions suggests that that reliance may reflect an overreading of our precedents. A brief chronological review of

our decisions concerning the Debt Limitation Clause will illuminate the issue.

The earliest case, and one of only two cases holding that the Debt Limitation Clause was violated, is the Court of Errors and Appeals decision in *Wilson v. State Water Supply Commission*, 84 *N.J.Eq.* 150, 93 *A.* 732 (1915). At issue in *Wilson* was the validity of a contract entered into by the State Water Supply Commission to acquire for state purposes a tract of land for a purchase price of one million dollars, secured by a mortgage to be amortized by funds annually appropriated by the Legislature. The Attorney General sought to enjoin the transaction on the ground that it authorized State debt in violation of the Debt Limitation Clause. The chancery court denied the injunction, reasoning that the debt had been incurred by the Water Commission and not by the State. Reversing, the Court of Errors and Appeals observed that "there are very practical reasons why the word 'debt' in the Constitution should be construed to include those payable by legislative appropriation[.]" 84 *N.J.Eq.* at 159, 93 *A.* 732. The court added:

> In dealing with all of these attempts to pare down this provision of the Constitution, it must be constantly borne in mind that it is the only one in that entire instrument in which the right to pass upon a law after it has been enacted by the Legislature is expressly reserved to the people. Such a provision should be construed so as to effectuate, not to frustrate, its object, which latter result is surely accomplished if the propriety of a purchase of this magnitude can, by a general law, be turned over bodily to four or five citizens.... It cannot be that the Legislature by a wholesale abdication of its constitutional functions can defeat this unique provision of the organic law.
>
> [84 *N.J.Eq.* at 159, 93 *A.* 732.]

*New Jersey Turnpike Authority v. Parsons*, 3 *N.J.* 235, 69 A.2d 875 (1949), is the first Debt Limitation Clause decision by this Court, and concerned the constitutionality of provisions of the New Jersey Turnpike Authority Act, L.1948, c. 454, L.1949, cc. 40 and 41, that authorized the Authority to issue revenue bonds to finance construction of the New Jersey Turnpike. The enabling legislation provided that the bonds shall be "payable solely from [turnpike] tolls and revenues" and that such bonds "shall not be deemed to constitute a debt or liability of the State ... or a

pledge of the faith and credit of the State." The Court held that the Turnpike Authority Act did not violate the Debt Limitation Clause, noting that the Turnpike Authority, although created by the State, was an independent entity for whose debts the State had no liability. *Id.* at 243, 69 *A.*2d 875. The Court emphasized the statutory language explicitly stating that the Authority's bonds "shall not be deemed to constitute a debt or liability of the State," as well as the language stating that the bonds were to be repaid only from tolls or revenues of the turnpike project. *Id.* at 242, 69 *A.*2d 875. In view of those explicit statutory provisions, the Court declined to decide whether the availability of a dedicated revenue source, in and of itself, was sufficient to sustain the Act's constitutionality. *Id.* at 246, 69 *A.*2d 875.

*Behnke v. New Jersey Highway Authority,* 13 *N.J.* 14, 97 *A.*2d 647 (1953), implicated the Debt Limitation Clause only indirectly. At issue was the constitutionality of the so-called Guaranty Act, *L.* 1952, *c.* 17, that authorized the State to guarantee payment of the principal and interest on bonds not exceeding $285,000,000 issued by the New Jersey Highway Authority to finance construction of the Garden State Parkway. Consistent with the Debt Limitation Clause of the Constitution, the Act authorizing the State's guaranty of the Highway Authority's bonds *was submitted to the voters at the 1952 general election and was approved.* Nevertheless, the Guaranty Act was challenged as violating Article VIII, Section II, paragraph 1 of the Constitution that provided: "The credit of the State shall not be directly or indirectly loaned in any case." Rejecting that contention, the Court observed that if by compliance with the Debt Limitation Clause the State could incur the debt itself, it necessarily followed that the State could "provide in the service of the public interest the financial support necessary for an economical and efficient performance of the undertaking, in the form of an unconditional guaranty of the payment of the bonds issued by the Authority to that end." *Id.* at 27–28, 97 *A.*2d 647. Accordingly, the Court sustained the validity of the Guaranty Act.

*McCutcheon v. State Building Authority*, 13 *N.J.* 46, 97 *A.2d*
663 (1953), *overruled* by *Enourato v. New Jersey Building Authority*, 90 *N.J.* 396, 410, 448 *A.2d* 449 (1982), is the only other
case to invalidate a statute because it authorized the issuance of
debt in violation of the Debt Limitation Clause. The statute in
*McCutcheon* established the State Building Authority as an independent state agency authorized to acquire buildings for lease only
to the State and to finance their acquisitions by the issuance of
bonds, without voter approval, to be amortized solely by rentals
paid by the State to the Authority. The statute mandated that
the Authority's bonds did not constitute a debt or liability of the
State and that the bonds be so endorsed. The rentals paid by the
State were required to be in an amount sufficient to amortize the
Authority's debt. The suit challenged the constitutionality of the
enabling legislation, and also challenged four specific leases between the Authority and the State on the ground that the State's
aggregate rental obligation under those leases also violated the
Debt Limitation Clause.

By a 5–2 vote, the Court invalidated the statute as violative of
the Debt Limitation Clause. The Court noted that although
denominated as rentals the State's payments to the Authority "are
in substance and effect the purchase price of the property, for
they are to be sufficient in amount to defray the Authority's
operating expenses and in the end to liquidate the principal of the
bonds and the interest accruing thereon," *id.* at 59, 97 *A.2d* 663,
and observed that the Authority was "non-revenue producing . . .
[and] wholly dependent upon state moneys raised by taxation," *id.*
at 62, 97 *A.2d* 663. The Court stated:

> While in form a way of providing the State with leasehold interests in building
> facilities for public use, in reality the design of the act is to enable the State by
> contracts of purchase to acquire for state use buildings possessed and constructed
> by the Authority by means of bond issues sustained by the State's promise to
> supply in the guise of rentals sufficient money to liquidate the bonds, available only
> through the medium of annual appropriations. And this in disregard of the
> constitutional debt limitation and the restraints laid by the organic law upon the
> appropriation process. . . . The label is unimportant; it is not the form but the
> essence that controls. It is an obvious truism that constitutional limitations may
> not be set at naught by indirection.

[*Id.* at 57, 97 *A.*2d 663.]

Dissenting, Justices Jacobs and Brennan were satisfied that the Debt Limitation Clause was not offended because the State assumed no liability for the Authority's bonds, and also asserted that the State's use of the Authority to acquire buildings that the State previously occupied and would continue to occupy constituted a sound business decision. *Id.* at 73–75, 97 *A.*2d 663 (Jacobs and Brennan, Jr., JJ., dissenting). Their observations about the likelihood that the State would occupy the buildings whether or not owned by the Authority could be understood to suggest that, to the extent of the buildings' fair rental value, the Authority's debt issuance did not increase State appropriations.

Debt Limitation Clause challenges were rejected on similar grounds in both *City of Passaic v. Consolidated Police and Firemen's Pension Fund Commission,* 18 *N.J.* 137, 113 *A.*2d 22 (1955) and *State v. Lanza,* 27 *N.J.* 516, 143 *A.*2d 571 (1958). In *City of Passaic,* at issue was a 1952 amendment, *L.* 1952, *c.* 358, to the statutes concerning pensions for police and firefighters that, in part, obligated the State over the ensuing thirty years to contribute annually to the pension fund such amounts as would be required to restore the fund to solvency. Unanimously rejecting the constitutional challenge, the Court observed that "[n]o debt has been created here, but rather present legislation merely provides that the State shall annually contribute to the fund." 18 *N.J.* at 147, 113 *A.*2d 22. Similarly, in *Lanza,* the challenged statute authorized the then Commissioner of Conservation and Economic Development to acquire land in Hunterdon County to establish a water supply system, and also obligated the State to reimburse the affected municipalities in gradually decreasing amounts for property taxes lost by reason of the State's acquisition of the property, the State to be reimbursed out of proceeds received from the sale of water. The Court rejected the contention that the obligation to the municipalities statutorily imposed on the State violated the Debt Limitation Clause. The Court observed that "[t]here is no bargain or professed contractual, conventional or legal undertaking to recompense the given loss of tax

revenue, but rather a truly 'voluntary appropriation' for a 'lawful object.'" (citations omitted). 27 *N.J.* at 525, 143 *A.*2d 571.

*Clayton v. Kervick,* 52 *N.J.* 138, 244 *A.*2d 281 (1968), was a declaratory judgment action filed against the State Treasurer by the Acting Commissioner of Education to test the validity of a statute establishing the New Jersey Educational Facilities Authority, *L.* 1966, *c.* 106. The Authority was an independent agency empowered to construct projects for participating educational institutions to be financed by bonds issued by the Authority that were not to be deemed a liability of the State nor to implicate a pledge of the State's credit. The projects undertaken by the Authority generally were to involve revenue-producing facilities such as dormitories. *Id.* at 142, 244 *A.*2d 281. The facilities constructed were to be leased to the participating colleges in return for rentals sufficient to cover amortization of the related bonds, and the colleges were expected to pay the rentals "'by deriving revenues from such projects,'" and also by using annual appropriations received from the Legislature. *Id.* at 144, 244 *A.*2d 281. The matter was tried on a stipulation of facts that acknowledged that the Authority's anticipated bond issuance would exceed the amount that triggered the requirement for voter approval under the Debt Limitation Clause. *Id.* at 143–44, 244 *A.*2d 281.

The Court upheld the constitutionality of the legislation and rejected the contention that the proposed bond issuance violated the Debt Limitation Clause, relying essentially on the fact that the colleges primarily would use revenues generated from the projects as the source of rental payments to the Authority. The Court analogized the funding mechanism to the self-liquidating financing methodology sustained in *New Jersey Turnpike Authority, supra,* 3 *N.J.* 235, 69 *A.*2d 875.

Although these decisions, along with the dissent in *McCutcheon,* appear to us to be clearly the more persuasive, the Educational Facilities Authority stands on even firmer ground. The Building Authority in *McCutcheon* was created to aid the State government and, under the explicit terms of the statute, it could lease its buildings only to designated State departments whose rental payments would come entirely from legislative appropriations. On the other hand, the Educational Facilities Authority was created to benefit the public through the expansion of

college and university facilities within the State, *and the annual rentals on its leases with the participating public and private educational institutions were intended to come mainly from sources unrelated to legislative appropriations. With that in mind, its operations may be compared favorably to the many self-liquidating projects which have been sustained in our State and elsewhere.*

. . . .

In the light of all of the foregoing, we have no hesitancy in expressing our agreement with the trial court's holding that the legislative plan embodied in the Educational Facilities Authority law did not in anywise violate the debt limitation clause of the Constitution (art. VIII, § II, par. 3).

[*Clayton, supra,* 52 *N.J.* at 154–55, 244 *A.*2d 281 (emphasis added) (citations omitted).]

Justice Hall, concurring in part and dissenting in part, agreed that the independent revenue source was sufficient to distinguish the case from *McCutcheon*, decided fifteen years earlier, but expressed concern that the majority had "whittled [*McCutcheon*] down so that substantially nothing is left." He added:

The interposition of a so-called autonomous agency between the Legislature and the state agency or department benefited in such a situation is to me, realistically, only doing indirectly by means of a conduit what may not validly be done directly, absent referendum approval.

If it is felt we can no longer live with the debt limitation and public aid project provisions of the 1947 Constitution, they ought to be amended by the prescribed method rather than through legislative nullification or evasion and judicial sanction thereof.

[*Id.* at 159, 97 *A.*2d 663 (Hall, J., concurring in part and dissenting in part).]

*Holster v. Board of Trustees of Passaic County College,* 59 *N.J.* 60, 279 *A.*2d 798 (1971), was the first case in which a challenge to a bond issue allegedly subject to the Debt Limitation Clause and to be amortized solely by legislative appropriations was rejected by the Court, notwithstanding the absence of an independent revenue source. The issue in *Holster* concerned the constitutionality of the County College Bond Act, *L.* 1971, *C.* 12, a statute intended to implement the provisions of the original County College enabling legislation, *L.* 1966 *C.* 302, that authorized County colleges to apply for and receive State support for up to one-half of the cost of capital projects. See *N.J.S.A.* 18A: 64A–22. The County College Bond Act contemplated that the County in which the County College was located would issue bonds, and the proceeds

would be applied to pay the State's fifty percent share of the capital project, the interest payments and the principal of the bonds at maturity to be paid solely by legislatively authorized appropriations. The statute also specified that bonds issued pursuant to the Act "shall not be deemed to constitute a debt or liability of the State or a pledge of the faith and credit of the State...." *N.J.S.A.* 18A:64A–22.8.

Unanimously sustaining the statute against a challenge based on the Debt Limitation Clause, the Court relied on the "accepted principle of statutory interpretation that, if possible, legislation will be so read as to sustain its constitutionality." *Id.* at 66, 279 *A.*2d 798. The Court also focused on the fact that the issuer was a County rather than the State, and emphasized the analogy to its earlier decisions in *Passaic, supra,* 18 *N.J.* 137, 113 *A.*2d 22 and *Lanza, supra,* 27 *N.J.* 516, 143 *A.*2d 571, cases in which statutes imposing State obligations to make payments out of annual appropriations were sustained against Debt Limitation Clause challenges:

> Of the cases discussed above, *Passaic v. Consolidated Police,* etc., *Pension Fund Commission* and *State by McLean v. Lanza* are closest in point to the matter before us. In each of those cases, as is true here, the statute under review purported to provide for, or clearly anticipated, the future repayment or funding of a proposed expenditure or commitment by later legislative appropriation, and in each case this was held not to create a present debt or liability on the part of the State. Despite the language of the County College Bond Act, which might seem on its face to require the State to pay the bonds, we do not so interpret the statute. Rather, noting as we must the explicit declaration in the act itself that the bonds shall not be debts or obligations of the State, bearing in mind the trend of our own decisional law and mindful of our obligation to sustain as constitutional any legislative enactment if that can reasonably be done, we repeat that the bonds are not the obligations of the State but only of the counties that decide to issue them. Furthermore a county may not turn to the State for exoneration or reimbursement.
>
> [*Holster, supra,* 59 *N.J.* at 73, 279 *A.*2d 798.]

Approximately one year after the Court's *Holster* decision, a sharply divided Court (4–3) sustained the constitutionality of the New Jersey Sports & Exposition Authority Law, *L.* 1971, *c.* 137, against a Debt Limitation Clause challenge. *New Jersey Sports & Exposition Auth. v. McCrane, supra,* 61 *N.J.* 1, 292 *A.*2d 545. That statute was enacted to facilitate the construction of a sports

complex in the Hackensack meadowlands to include a racetrack for horse racing and other facilities, and to that end established as an independent authority the New Jersey Sports & Exposition Authority. That Authority was empowered to issue bonds to finance the cost of construction of the overall project, and the funds to amortize those bonds were to be derived solely from fees, revenues and other charges for use of the Authority's facilities. A major source of the Authority's revenues was to be derived from a horse race track with pari-mutual wagering, of which one-half of one percent would be paid annually to the State, and the balance during the life of the Authority's bonds, was to be allocated to the Authority for use in making amortization payments on the bonds.

The constitutional issue that divided the Court arose because the 1939 Amendment to the 1844 Constitution authorized horse racing with pari-mutual wagering "from which the State shall derive a reasonable revenue for the support of government." *Id.* at 13, 292 *A.*2d 545. That 1939 Amendment was incorporated in the 1947 Constitution by art. IV, § 7, ¶ 2, that referred to gambling " 'heretofore submitted to, and authorized by a majority of the votes cast by the people at a special election.' " *Id.* at 43, 292 *A.*2d 545 (Weintraub, J., concurring in part and dissenting in part). In the dissenter's view, the 1939 Amendment to the 1844 Constitution, that was incorporated in the 1947 Constitution, committed all revenues from pari-mutual betting to the State, and the provision in the Sports & Exposition Authority Act appropriating those revenues (except for one-half of one percent) to the Authority constituted a State debt in violation of the Debt Limitation Clause. *Id.* at 48, 292 *A.*2d 545 (Weintraub, J., concurring in part and dissenting in part).

The majority disagreed, observing that for purposes of the 1939 Amendment the Sports Authority must be regarded as an agency of the State and that its receipt of pari-mutual revenues satisfied the Amendment's requirement that the State "shall derive a reasonable revenue for the support of government." *Id.* at 23, 292 *A.*2d 545. The Court also noted that the one-half of one percent of

pari-mutual wagering retained by the State could generate approximately $1,700,000 annually, and that any remaining revenues not required by the Authority were to be paid to the State. *Id.* at 24, 292 *A.*2d 545. The Court therefore concluded that the statute did not violate the Debt Limitation Clause by reason of the 1939 Amendment to the 1844 Constitution. *Ibid.* Moreover, the Court also rejected the contention that the financing scheme amounted to a pledge of the State's revenues to repay the Authority's bonds, noting that the bonds expressly stipulated that the State was not liable therefor. *Id.* at 25, 292 *A.*2d 545. The Court also observed:

The modern science of government has found a method of avoiding [the debt] clause, and the courts have approved it. It is to create an autonomous public corporate entity to undertake the task and to borrow money for the purpose on its own bonds.... Funds to meet interest and principal of the bonds are derived solely from revenues generated by the agency's operation, which remain a special fund for that purpose until the bonds are fully paid.

[*Ibid.* (footnote omitted).]

Justice Hall, who with Justice Proctor joined Chief Justice Weintraub's separate opinion, filed his own opinion in which he concluded that the Court effectively had nullified the Debt Limitations Clause. He wrote:

Whether statutory enactments of this type fall within the four corners of the debt provision is certainly a question for judicial determination. That question has nothing to do with the wisdom of the statute nor does it validly bring into play rubrics about judicial deference to legislative action, presumptions of constitutionality and the like. The majority's stress thereon is inappropriate and misses the point. And I think it quite wrong for a court to aid evasion of a constitutional provision, last adopted only 25 years ago, because it believes that provision outmoded. The function of the judiciary is to enforce all constitutional provisions upon all branches of government and not to act as an Ad hoc constitutional convention to summarily render nugatory provisions with which it may disagree.

[*Id.* at 62, 292 *A.*2d 545 (Hall, J. concurring in part and dissenting in part).]

*Bulman v. McCrane,* 64 *N.J.* 105, 312 *A.*2d 857 (1973), did not involve the issuance of any bonds. There, a taxpayer sued to enjoin the State from entering into a twenty-five year lease on a building to be erected by a private developer on state-owned land for use as a record storage center and printing facility. Under the proposed lease, the State would have the option of purchasing the building during the tenth, fifteenth and twentieth years of the

lease and, if it did not exercise its option, title to the building would revert to the State at the end of the lease term. The plaintiff contended that the purported lease transaction was, in reality, an installment purchase agreement and that the aggregate amount of lease payments constituted State indebtedness incurred in violation of the debt Limitation Clause.

Reversing the Chancery Division decision enjoining the transaction, *Bulman v. McCrane*, 123 *N.J.Super.* 213, 240, 302 *A.*2d 163 (1973), the Court observed that "the lease terms generally are harmonious with the theory of a lease as opposed to a sale." 64 *N.J.* at 114, 312 *A.*2d 857. We noted that the lessor was required to pay property taxes and make exterior repairs, and that the rent would be suspended if damage to the building rendered it unusable. Moreover, the lessor's failure to complete repairs within six months constituted a basis for the State's termination of the lease. *Ibid.* Primarily, the Court stressed the fact that the building was to be erected on state-owned property and therefore would have minimal value to the developer at the end of the lease, a circumstance that justified a rental sufficient to permit the builder to recoup his entire capital investment during the lease term. *Id.* at 116–17, 312 *A.*2d 857. Based on those factors, the Court determined that the transaction was a lease rather than a purchase, that it involved no issuance of debt, and that the State's only obligation was "for future installments of rent." *Id.* at 117–18, 312 *A.*2d 857.

Of all the Court's opinions construing the Debt Limitation Clause, *Enourato, supra*, 90 *N.J.* 396, 448 *A.*2d 449, is perhaps the most difficult to reconcile with the Court's prior precedents. *Enourato* involved a challenge to the constitutionality of the New Jersey Building Authority Act, *L.* 1981, *c.* 120, that established the New Jersey Building Authority for the purpose of acquiring land and buildings and operating office facilities for state agencies. The Act authorized the Authority to issue bonds in amounts not exceeding $250,000,000 to finance land acquisition, building construction and related costs, such bonds to constitute the debt of

only the Authority and not of the State. Buildings constructed by the Authority would be leased to the State at rental rates sufficient to provide the Authority with funds to pay the amortization costs of its bonds, all rental payments to be subject to legislative appropriations. The sample lease included in the record revealed that during the term of the lease the State would pay all expenses related to the buildings, including insurance, and that at the expiration of the lease title to the buildings would be conveyed to the State. During the term of the lease the State could acquire a specific building by discharging the Authority's obligation on the related bonds. *Enourato v. N.J. Building Authority,* 182 *N.J.Super.* 58, 69–70, 440 *A.*2d 42 (App.Div.1981).

The *Enourato* Court rejected plaintiff's contention that the Act's financing mechanism violated the Debt Limitation Clause, and in the process, 90 *N.J.* at 410, 448 *A.*2d 449, overruled *McCutcheon, supra,* 13 *N.J.* 46, 97 *A.*2d 663. The Court relied expressly on its prior decisions in *Clayton, supra,* 52 *N.J.* 138, 244 *A.*2d 281, *Holster, supra,* 59 *N.J.* 60, 279 *A.*2d 798, and *Bulman, supra,* 64 *N.J.* 105, 312 *A.*2d 857, to support its conclusion. In doing so, it did not acknowledge that in *Clayton* a fact critical to the Court's decision was that annual rentals paid by the colleges to support bond amortization payments by the Educational Facilities Authority "were intended to come mainly from sources unrelated to legislative appropriations," *Clayton, supra,* 52 *N.J.* at 154, 244 *A.*2d 281; that in *Holster* the Court relied on the fact "that the bonds are not the obligations of the State but only of the counties that decide to issue them," *Holster, supra,* 59 *N.J.* at 73, 279 *A.*2d 798; and that the issue in *Bulman* involved no debt issuance but rather whether a twenty-five-year lease between the State and a private developer was more akin to an installment purchase transaction than a lease. The Court's analysis was summarized in a few succinct paragraphs:

> No relevant distinction exists between the financing schemes upheld in those cases [*Clayton* and *Holster*] and that in the New Jersey Building Authority Act. The Authority's bonds and notes are not a debt or liability of the State. They state on their face that the State does not pledge its faith and credit to their payment.

Although the Act not only contemplates that the State will make the necessary appropriations but also seeks to ensure this result, the State is under no legal obligation to do so. The Authority's creditors have notice that their only remedy lies against the Authority.

Nor does the liability of the State on its lease agreements with the Authority create any debt of the State. Both the statute and the lease make clear that all rent payments from the State are subject to legislative appropriations. Moreover, the State may incur liability for future rentals without violating the debt limitations clause. Plaintiff does not contend otherwise.

Since the Building Authority Act does not authorize the creation of any debts by the State, the debt limitations clause, *N.J. Const.* (1947), art. VIII § 2, ¶ 3, does not apply to the Authority's debts or any obligations of the State on its lease agreements with the Authority. We have already disapproved the contrary result reached by a sharply divided Court in *McCutcheon v. State Building Authority,* 13 *N.J.* 46, 97 *A.*2d 663 (1953), and now expressly overrule that case.

[*Enourato, supra,* 90 *N.J.* at 410, 448 *A.*2d 449 (citations omitted).]

*In re Loans of New Jersey Property Liability Insurance Guaranty Association,* 124 *N.J.* 69, 590 *A.*2d 210 (1991), although implicating Debt Limitation Clause issues, was decided on the basis that the State's contingent repayment mechanism to the Property Liability Insurance Guaranty Association (PLIGA) was too uncertain to constitute State debt. At issue was the validity of a Department of Insurance Order, promulgated pursuant to the Fair Automobile Insurance Reform Act of 1990, *L.* 1990, *c.* 8, requiring PLIGA to collect annual assessments of approximately $160 million from property-casualty insurers to be paid, as a loan, into the New Jersey Automobile Insurance Guaranty Fund (Auto Fund).

The Act did not expressly provide for repayment of the loan except to authorize for that purpose the use of proceeds from Division of Motor Vehicle surcharges for certain motor vehicle violations and drunk-driving convictions, after termination of the Joint Underwriting Association (JUA) and on certification by the Commissioner of Insurance that such surcharges no longer were needed to fund the JUA debt. *Id.* at 74, 590 *A.*2d 210. Relying on *City of Passaic, supra,* 18 *N.J.* 137, 113 *A.*2d 22, *Lanza, supra,* 27 *N.J.* 516, 143 *A.*2d 571, and *City of Camden v. Byrne, supra,* 82 *N.J.* 133, 411 *A.*2d 462, the Court determined that "[t]he provisions made under the Reform Act and [the] Order [ ] for repay-

ment of the PLIGA loans clearly fall within the types of assurances of future payments that this Court has traditionally found not to be 'debts.'" *Id.* at 77, 590 *A.*2d 210. The Court continued:

> The repayment of the PLIGA loans depends upon a number of contingencies— that there will be funds remaining from motor-vehicle violations surcharges after discharge of the JUA debt; that the Commissioner of Insurance will approve application of such funds to the repayment; that the Legislature will vote the necessary appropriation; and that the Treasurer will approve release of the funds. Thus, we conclude that the State's acceptance of the loans from PLIGA does not create a debt of the State and therefore does not violate article VIII, section II, paragraph 3 of the New Jersey Constitution.
>
> [*Ibid.*]

Because the PLIGA case implicated the Debt Limitation Clause only tangentially, the minority opinion in *Spadoro v. Whitman*, *supra*, 150 *N.J.* 2, 695 *A.*2d 654, essentially constitutes the most extensive judicial discussion of the Debt Limitation Clause by members of this Court since the *Enourato* decision in 1982. The appeal in *Spadoro* challenged the constitutionality of the Pension Bond Financing Act of 1997 (Bond Act), *L.* 1997, *c.* 114, as violative of the Debt Limitation Clause. Because the bonds authorized by the Bond Act "apparently were sold before the Court had an opportunity to decide whether to hear the appeal on the merits," *id.* at 14, 695 *A.*2d 654, the Court dismissed the appeal as moot. Justice Handler's separate opinion, concurring in part and dissenting in part, asserted that the issue of the validity of the Bond Act should be adjudicated because of its importance and likely recurrence, *id.* at 3, 695 *A.*2d 654, even if it were too late to grant the injunctive relief sought by plaintiff.

The Bond Act authorized the New Jersey Economic Development Authority (EDA) to issue approximately $2.7 billion in bonds in order to fund the pension systems' aggregate unfunded liability that was estimated at $3.2 billion. As noted, the State annually appropriates funds to defray the State's obligations to its pension funds, including annual contributions to fund pension benefits earned in prior years and to fund cost-of-living adjustment benefits payable by the various pension funds. The accrued unfunded

liability of approximately $3.2 billion primarily related to unfunded cost-of-living benefits. *Id.* at 5, 695 *A*.2d 654.

Because a contemporaneously enacted statute, *L.* 1997, *c.* 115, authorized a revaluation of the pension systems' assets to reflect market appreciation and the proceeds of the bond issuance, and because amortization of the bonds was anticipated to occur over a shorter period than the State's prior schedule for amortization of its unfunded liability, the Bond Act anticipated that the bond proceeds would be sufficient to eliminate the State's unfunded liability and also result in significant annual savings to the State as well. *Id.* at 4–8, 695 *A*.2d 654.

The statute also provided that the bonds were special and limited obligations of the EDA and "shall not be a liability of the State or any agency or instrumentality thereof." The Bond Act authorized the State Treasurer to enter into contracts with the EDA to fund its amortization obligations under the bond issue, but the State's obligation under any such contract would be subject to and dependent on annual appropriations by the Legislature for that purpose. *Id.* at 6–7, 695 *A*.2d 654.

The minority opinion concluded that without prior voter approval the EDA bond issue violated the Debt Limitation Clause. Referring to prior Debt Limitation Clause cases, Justice Handler noted that in those cases "the independent authorities were clearly separate governmental entities that served special and discrete governmental purposes.... Here, the EDA is functioning solely as a conduit to sell bonds. It is, in this context, a mere shell that serves no governmental function other than to issue the bonds for the State itself, becoming, in effect, a shield to insulate the State from being labeled a debtor." *Id.* at 9–10, 695 *A*.2d 654.

Justice Handler also observed that the EDA had no independent funding source for amortization of its bonds.

Furthermore, in other cases a separate source of income had been created by the independent authorities as a basis for funding their separate operations and fulfilling their specific public purposes. See *Clayton, supra,* 52 *N.J.* at 154, 244 *A*.2d 281 (rental payments to be made by various public and private colleges constituted separate source of income); *New Jersey Turnpike Auth., supra,* 3 *N.J.*

at 238, 69 *A*.2d 875 (tolls and other revenues constituted separate source of income). Under the Bond Act, the EDA has no governmental function or purpose that requires funding as such, and no separate source of income is created to enable the EDA to repay the bonds.

[*Id.* at 10, 695 *A*.2d 654.]

In addition, Justice Handler distinguished the purpose of the Bond Act from prior cases, noting that

unlike any other previous bond issue [ ] its purpose and its proceeds are directed only to defray the ordinary expenses entailed in the regular operation of government. In the past, debts incurred by the State in compliance with the Debt Limitation Clause have been debts that relate generally to governmental purposes distinct from the regularly recurring operations of the State. Previous bond issues have involved government purposes, such as major capital improvements, capital construction and the provision of special services. *See Enourato, supra,* 90 *N.J.* 396, 448 *A*.2d 449 (State created Building Authority, which issued bonds to build and operate facilities for state agencies); *Bulman v. McCrane,* 64 *N.J.* 105, 312 *A*.2d 857 (1973) (State contracted to have building constructed in return for its agreement to lease the building for twenty-five year term for use as a records storage center and printing facility); *Holster v. Board of Trustees of Passaic Cty. College,* 59 *N.J.* 60, 279 *A*.2d 798 (1971) (County College Bond Act enabled counties to issue bonds, the proceeds of which were to be devoted to capital outlays); *Clayton, supra,* 52 *N.J.* 138, 244 *A*.2d 281 (State created the New Jersey Educational Facilities Authority, which issued bonds to construct projects for participating educational institutions); *New Jersey Turnpike Auth., supra,* 3 *N.J.* 235, 69 *A*.2d 875 (State legislature created the New Jersey Turnpike Authority which issued bonds to construct toll roads).

The Bond Act provides for the issuance of approximately $2.7 billion in bonds to generate moneys to pay for the accrued unfunded liability of various pension systems. The debt is created in order to meet current and future pension contributions. The provision of pensions for public employees is simply a part of the State's obligation to compensate its employees, and is clearly a regular function of government and an ordinary government operating expense.

[*Id.* at 10–11, 695 *A*.2d 654.]

The minority opinion concluded by observing that if the Bond Act were constitutional the Debt Limitation Clause would be rendered a nullity:

The apparent assumption underlying the Bond Act is that the restrictions of the Debt Limitation Clause may be avoided merely by the device of substituting an independent authority, rather than the State, as the issuer of the debt, even though the authority has no genuine independence or separate source of revenue and marketability of the bonds rests entirely and exclusively on the State's commitment to make the amortization payments as they come due. Moreover, the availability of insurance, at a substantial premium cost, compensates substantially for the credit worthiness that a direct pledge of the State's credit would have achieved. If

the combination of an independent authority as issuer, together with bond insurance, permits the State to avoid the Debt Limitation Clause and market bonds as readily as if they were General Obligation Bonds, why would any future Legislature or Governor be inclined to comply with the constitutional limitation on debt?

Our precedents do not and should not permit the Debt Limitation Clause to be so easily sidestepped. I believe that none of our previous cases support the conclusion that the Bond Act has not, in fact and in the constitutional sense, created a State debt. If the State is permitted to incur debt in order to meet current operating expenses, payable only from the State's general revenues, it is hard to imagine any debt issuance by a state agency that would run afoul of the Debt Limitation Clause.

[*Id.* at 12, 695 *A*.2d 654.]

A careful analysis of this Court's Debt Limitation Clause jurisprudence reveals that of the six cases in which the issuance of non-State debt has withstood a Debt Limitation Clause challenge, four of those cases involved bond issues that would be amortized primarily by revenue sources other than annual legislative appropriations. See *New Jersey Turnpike Auth., supra,* 3 *N.J.* at 238, 69 *A.*2d 875 (noting that amortization was to be payable solely from Turnpike tolls and revenues); *Behnke, supra,* 13 *N.J.* at 20, 29, 97 *A.*2d 647 (sustaining Guaranty Act, approved by voters, authorizing State to satisfy obligations arising from New Jersey Highway Authority bonds "in the event the revenue from tolls and otherwise shall be insufficient for the purpose" and noting that Highway Authority's tolls and revenues are pledged to secure amortization of bonds); *Clayton, supra,* 52 *N.J.* at 154, 244 *A.*2d 281 (noting that annual rental payments on leases of facilities to educational institutions by Educational Facilities Authority, to be applied to bond amortization payments, "were intended to come mainly from sources unrelated to legislative appropriations"); *New Jersey Sports & Exposition Auth., supra,* 61 *N.J.* at 10, 292 *A.*2d 545 (noting that the "interest and principal of the bonds or notes [were] to be met out of the fees, rents and other charges for admission to or use of the facilities and from the grant of concessions therein.").

Of the other two cases, *Holster* and *Enourato,* Holster is unique in that the issuer of the bonds to be amortized by annual legislative appropriations was the County of Passaic,—not the State and

not a state authority—an entity with independent taxing authority and revenue sources. Noting that "the bonds are not the obligations of the State but only of the counties that decide to issue them," 59 *N.J.* at 73, 279 *A.*2d 798, the Court stated:

> Hence, both issuing counties and purchasing bondholders are on notice that the faith and credit of the State will not be pledged in respect of bonds issued pursuant to his enactment, but that payment on the part of the State will be dependent upon appropriations provided from time to time. Lacking such appropriations, recourse can be had only against the county which will have no recourse over against the State.
>
> [*Id.* at 66–67, 279 *A.*2d 798.]

Thus, of all the Debt Limitation Clause cases only *Enourato* holds that debt issued by a state authority that lacks an independent revenue source and contemplates the use of rental payments from the State, authorized by annual legislative appropriations, as the source of the Authority's bond amortization payments, is sustainable without voter approval under the Debt Limitation Clause. The scope of the Court's holding in *Enourato* obviously is debatable. The Court's opinion emphasized in part that "[t]he Authority's bonds and notes are not a debt of the State," *Enourato, supra,* 90 *N.J.* at 410, 448 *A.*2d 449, but also focused in part on the principle that State liability for rent does not constitute debt: "[T]he State may incur liability for future rentals without violating the debt limitations clause." *Ibid.* Although the State's rental payments under the statute upheld in *Enourato* were calculated to be sufficient to satisfy the authority's obligations on the bonds, that portion of the State's rental payments that equaled the fair rental value of the buildings occupied did not necessarily cause the State to *increase* its annual appropriation for rents; arguably, only the amount by which the rental payments required to amortize the bonds exceeded such fair rental value caused an increase in appropriations attributed directly to the bond issue. Although not expressly relied on by the Court, the recognition, also expressed by the dissenters in *McCutcheon, supra,* 13 *N.J.* at 75, 97 *A.*2d 663 (Jacobs and Brennan, Jr., JJ., dissenting), that the State would be making rental payments as a tenant even absent the Authority funding mechanism undoubtedly was a factor underly-

ing the Court's disposition. In my view, *Enourato* should not be read as holding the Debt Limitations Clause inapplicable whenever a state authority issues its own bonds without voter approval or an adequate independent revenue source and to be amortized solely by funds annually appropriated by the Legislature.

## III

### A

The economic realities of the State's need for access to capital markets compels the conclusion that, in terms of the purposes underlying the Debt Limitation Clause, appropriations debt is virtually indistinguishable from general obligation debt. The classic description of the purpose of the Debt Limitation Clause is that it prohibits " 'one Legislature from incurring debts [that] subsequent Legislatures would be obliged to pay, without prior approval by public referendum.' " *City of Camden, supra,* 82 *N.J.* at 152, 411 *A.*2d 462 (quoting *New Jersey Sports & Exposition Auth., supra,* 61 *N.J.* at 13–14, 292 *A.*2d 545). Although the State has no "legal" liability for the appropriations debt of its Authorities, the capital markets and the rating agencies clearly understand that such debt unmistakably constitutes debt that, as expressed in *City of Camden, supra,* " 'subsequent Legislatures would be obliged to pay.' "

A recently issued Research Report by Standard & Poor's, one of the nation's most prominent bond rating agencies, explains that general obligation bond and appropriations debt are virtually indistinguishable as credit risks and that appropriations debt, as a practical matter, must be paid by the State whose agency issued the debt in order for that State's credit rating to be maintained. Standard & Poor's, Revised Lease and Appropriation–Backed Debt Rating Criteria (June 13, 2001). The Report states:

> Standard & Poor's has been rating appropriation-backed debt for more than two decades. Over that time, we have seen a greater acceptance of this form of debt within the public markets. Once confined to a limited number of municipal governments in California, this type of debt issuance is now common in at least 33

states. Over the last 20 years, the occurrence of a default on appropriation-backed debt has been similar to the default rate of general obligation bonds. The default risk is low for both types of debt issuance and the significant difference in credit risk identified by a rating differentiation of one full category no longer accurately reflects the minimal difference in default risk. Standard & Poor's has also seen appropriation-backed contracts become a critical component of both state and local governments' capital infrastructure programs, in some instances making up over 50% of the capital program. Furthermore, state and local government managements understand the capital markets and obligations under these programs. *Finally, while appropriation-backed bonds are not considered debt under a strict legal definition, Standard & Poor's considers all appropriation-backed bonds of an issuer to be an obligation of that issuer and a failure to appropriate will result in a significant credit deterioration for all types of debt issued by the defaulting government.*

[S & P Rating Criteria, *supra,* at 1 (emphasis added).]

Based on that analysis, Standard & Poor's has concluded that "lease and appropriation debt ... tracks precisely with the obligor's long term rating," with the result that "appropriation obligations that meet our legal criteria will be rated one notch off the general obligation ratings, effectively eliminating the historic reliance on essentiality as a credit factor." *Id.* at 1.[10]

Recent rating agency reports on New Jersey's credit standing reveal the extent to which the State has altered its debt profile in the past decade by increasing substantially its reliance on appropriations debt. As Standard & Poor's recently observed:

As of June 30, 2001, New Jersey had just $3.5 billion of GO [General Obligation] debt outstanding but more that $10.8 billion of appropriation-backed debt obligations including pension funding bonds. Over the last six years, the state has significantly altered its debt profile, relying much more on appropriation-backed debt to support its growing capital program. Overall, tax-supported debt rose to $14.3 billion in fiscal 2001–up nearly 60% from fiscal 1996. Appropriation-backed debt accounted for nearly all of that increase, increasing $6 billion from its fiscal 1996 level. Appropriation-backed debt now makes up 75% of the state's tax-supported debt compared to 56% in fiscal 1996. Debt ratios increased to $1,700

---

[10] The "one notch" difference between the ratings of general obligation and appropriation bonds, pursuant to Moody's recent downgrade of New Jersey's bond rating, *infra* at 499–500, 809 A.2d at 132–33, translates into a rating of Aa2 for general obligation bonds and Aa3 for most of the State's appropriation bonds. Those ratings ordinarily involve an interest rate differential of only ten to fifteen basis points, so that if the interest rate for general obligation bonds were 5% the rate on appropriation bonds would range from 5.1 to 5.15%.

per capita and 4.4% of personal income, compared to $978 per capita, and 3.2% of income six years ago. Debt service costs associated with the pension issue are now a fixed cost to the budget, but the general fund contribution to the unfunded pension liability is eliminated. Debt service in fiscal 2000 was 4.4% of operating fund appropriations.

Debt levels are likely to continue to rise as the state addresses the education and transportation sectors, which will require additional bonding of up to nearly $11 billion. In both areas, the state plans to use appropriation-backed debt as its primary financing vehicle.

[Standard & Poor's, Research: New Jersey; Tax Secured, General Obligation (Oct. 3, 2001).]

## Similarly, a December 1999 report from Moody's Investors Service states:

Over the past nine years, New Jersey's growth in outstanding debt has significantly outpaced its growth in population and personal income, and its debt ratios have been negatively affected both on an absolute basis and relative to the 50 state medians. Between 1990 and 1999, net tax-supported debt rose from $4.1 billion to its current $14.7 billion, and is now fourth highest among the states. The ratio of debt to personal income (5.3%) is seventh highest among the states and some 250% of the median. Debt per capita, at approximately $1,810, is fifth highest among the states.

The increase in state debt reflects significant investments made during the 1990s to maintain and improve the state's transportation infrastructure, and to renovate and construct numerous state offices, a prison, and other facilities. In addition, the state has incurred debt for a number of non-traditional purposes, including a deficit financing for a high-risk auto insurance pool, various sports and exposition facilities, and to address the state's unfunded pension liability. The state's increasing debt trend is expected to continue over the next five years, with the transportation program, public school renovation and construction, and open space acquisition among the more prominent additional debt plans at present. The size and structure of the school bond program—potentially among the most ambitious in the country—is expected to be announced during 2000.

To date, New Jersey's debt has remained affordable in the context of its substantial economic resources. Even with the boom in state tax revenues, however, debt service (including lease and contract payments) has been steadily growing as a percentage of the budget—reaching about 6.9% of total appropriations in fiscal 2000. The state's lease and other obligations payable subject to appropriation, once a modest component of the state's debt, now represent over 75% of direct debt. The maturity profile of this component has been lengthening as well, with transportation bonds now issued for a 20 year term, and the pension funding bonds issued for a 32 year term.

[Moody's Investors Service, State of New Jersey—Analysis (December 1999) (emphasis added).]

The unprecedented increase in the State's reliance on appropriations debt vividly demonstrates that, as a practical matter, the State's commitment to the amortization of its appropriation debt is indistinguishable from its legal liability for general obligation debt. The fact that appropriations debt totals $10.8 billion, or approximately seventy-five percent of the State's June 30, 2001, total tax-supported debt of $14.3 billion, graphically illustrates the extent to which the State's creditworthiness and continued access to the capital markets requires that it discharge in a consistent and timely manner its full obligation to amortize appropriation debt as well as its general obligation debt. The State's reliance on the theoretical assertion that appropriations debt is not State debt for purposes of the Debt Limitation Clause because the State is not directly liable thereon is a legal fiction that, for purposes of the constitutional objective, exalts form over substance. The State can no more permit default on its appropriations debt than it can allow its utility and telephone bills to go unpaid.

Although the record is not explicit, the Official Statements that fully describe various issuances of appropriations debt included within the $10.8 billion of such debt outstanding on June 30, 2001, reveal that a substantial portion of that debt lacks an independent revenue source for use in amortization of the debt, with the result that amortization will be entirely dependent on annual legislative appropriations. Examples of appropriation debt unsupported by an independent revenue source include: The New Jersey Economic Development Authority State Pension Fund Bonds ($2.8 billion); New Jersey Economic Development Authority School Facilities Construction Bonds ($500,000,000 issued, $8.6 billion authorized); New Jersey Economic Development Authority State Office Building Projects ($60,700,000 issued); New Jersey Educational Facilities Authority Equipment Leasing Fund Program ($87.3 million issued, $100,000,000 authorized; during term of lease of equipment to colleges, EFA retains title to equipment and transfers title when bonds have been paid).

In comparison, amortization of outstanding series bonds issued by the New Jersey Transportation Trust Fund Authority (TTFA), subject to annual legislative appropriations, is supported by both statutory and constitutional dedication of State revenues in amounts apparently sufficient to pay the annual amortization of the TTFA 2001 Series Bonds and the unrefunded Prior Series Bonds through the year 2022. The constitutional dedication includes nine cents per gallon of the State's motor fuel tax (voter-approved in 1995 and yielding approximately $400 million per year), $200 million annually from the gross receipts tax on petroleum products and $200 million annually, as of 2003, from the sales and use tax on automobiles (both dedications approved by voters in November 2000). The statutory dedications include $24.5 million annually from Toll Road Authority contracts, and not less than $60 million annually from increased motor vehicle registration fees pursuant to *N.J.S.A.* 17:33B–63. As of June 30, 2001, the total outstanding amount of TTFA appropriations debt was approximately $4.3 billion; additional Series A and Series B bonds aggregating $1.015 billion were issued in August 2001 and January 2002, and amortization payments in fiscal year 2002 totaled approximately $400 million. Thus, to the extent that the existence of "a separate source of income" to amortize an Authority's appropriation-backed debt, see *Spadoro, supra,* 150 *N.J.* at 10, 695 *A.*2d 654 (Handler, J. concurring in part and dissenting in part), may insulate that debt issuance from vulnerability under the Debt Limitation Clause, the income available to amortize the TTFA appropriations debt appears to be adequate to satisfy that standard.[11]

---

[11] One could foresee the possibility that the independent revenue source determined upon issuance to be sufficient to support amortization of a specific appropriations debt bond issue may, because of changed circumstances, turn out to be insufficient to support annual debt service, thereby requiring legislative appropriations to make up the difference. Although the issue is not before us, I assume that the determination whether such a bond issue is vulnerable to a Debt Limitation Clause challenge would be made as of the date of issuance of the bonds.

Another practical reality revealed by the recent increase in the State's aggregate debt, and the likelihood of its requirements for future debt issuance, is that the Constitution's Debt Limitation Clause provisions no longer constitute the most relevant checkpoint against which to determine when total State debt is approaching unsafe levels. Based on the fiscal year 2001–02 budget of approximately $22 billion, the Debt Limitation Clause would require approval of any State-issued debt in excess of $220 million (one percent of "the total amount appropriated by the general appropriation law for that fiscal year," *N.J. Const.* art. VIII, § 2, ¶ 3).

Although in March 2002 Moody's Investors Service downgraded the State's *general obligation bond rating from Aa1 to Aa2,* the accompanying report continued to comment favorably on the State's economic strength notwithstanding that its outstanding debt amounted to $14.8 billion:

STATE'S ECONOMY AND HIGH RESIDENT WEALTH LEVELS SUPPORT LONG TERM CREDIT STRENGTH, ALTHOUGH DEBT LEVELS CONTINUE TO INCREASE

The new rating of Aa2 reflects the state's large and diverse economy, high personal income levels, and historic record of strong financial controls producing sizable ending fund balances. In the longer-term, we expect these credit strengths to persist.

. . . .

The rating also reflects a trend of growth in outstanding state debt that has significantly outpaced that of population and personal income over the past decade, negatively affecting the state's debt ratios. *To date, the increased debt level has remained affordable in light of the state's substantial economic resources.* However, future capital spending and borrowing plans are extensive, and the ratio of debt service to annual revenues is likely to continue to increase. For fiscal 2003, the ratio will likely be close to 7.5%, above average compared to other states.

[Moody's Investors Service, Rating Update: New Jersey [ ] (March 4, 2002) (emphasis added).]

Thus, from the perspective of the rating agencies, the aggregate amount of State debt—both general obligation and appropriations debt—and the State's capacity to amortize that debt in relation to its other obligations, are determinative of the State's credit rating and its continued ability to have access to the capital markets. Accordingly, a more relevant standard, as confirmed by the March

2002 Moody's report, is "the ratio of debt service to annual revenues," a ratio that Moody's estimates will approach 7.5 percent in fiscal year 2002–03. Consistent with that more realistic standard for determining affordable debt levels, the Attorney General has informed the Court of the introduction in December 2001 of Assembly Concurrent Resolution No. 173 that proposes to amend the Constitution by limiting debt service on State appropriations debt (other than appropriations debt approved at a general election by a majority vote) to eight percent of the total amount authorized to be expended in the fiscal year in which the appropriations debt is to be issued. A.C. Res., 209th Leg. (NJ 2001). Appropriations debt secured by State leases is excluded from that proposed limitation. Although expressing no view on the wisdom of that or any other proposal, the utility of a more relevant statutory or constitutional limitation on the State's ability to issue appropriations debt is difficult to contest.

I also take note of the relevant provisions of Article IX of the Constitution that require: (a) publication of proposed amendments at least once in each County three months prior to the general election (scheduled for November 5, 2002), (b) submission of proposed amendments to the members of the Senate and General Assembly at least twenty calendar days prior to first vote, and (c) either a three-fifths vote in each house for submission to the voters in the current year, or a majority vote in each house for two successive years for submission to the voters in the second year. *N.J. Const.* Art. IX ¶ 1, 3.

## B

In my view, the conclusion is inescapable that the issuance of debt without voter approval by an independent state authority, unsupported by an adequate independent revenue source and to be amortized by annual legislative appropriations, violates the Debt Limitation Clause. As I have demonstrated, reliance on the lack of State "legal" liability for such debt exalts form over substance: the State's appropriations debt dwarfs its general

obligation debt by a three-to-one ratio, and its failure to pay any of that debt would damage substantially its credit rating and its access to capital markets. For purposes of the Debt Limitation Clause's objectives, appropriations debt binds future legislatures in a manner and to an extent that is indistinguishable from general obligations debt. The Court's choice is either to recognize that indisputable reality, or to subvert the Constitution by allowing the State to continue to issue appropriations debt as if the Debt Limitation Clause did not exist. I choose to respect the Constitutional mandate.

Nevertheless, significant equitable and practical considerations require that the interpretation of the Debt Limitation Clause that I adopt be applied only prospectively, after affording the other branches of government adequate time to react to that determination. As noted, *supra* at 471–75, 809 *A.2d* at 112–16, in enacting EFCFA the Legislature obviously relied on our decisions in *Abbott IV* and *V* in designing the statute's financing mechanism. Moreover, the Legislature and the Executive undoubtedly have relied on at least fifty years of decisional law, *supra* at 475–94, 809 *A.2d* at 116–28, in adopting a financing policy that assumed that the Debt Limitation Clause did not apply to appropriations debt issued by independent state Authorities.[12] Another factor justifying prospective application is the time required to conform to the procedures that govern constitutional amendments.

---

[12] I note the theoretical possibility that my primary rationale for invalidating appropriations debt under the Debt Limitations Clause—the inevitability that the Legislature will appropriate funds to pay debt service on independent Authority bonds irrespective of the State's legal liability—arguably could be said to apply to debt issued by local or county governmental entities whose default on bonds previously issued might reflect indirectly but unfavorably on the State's credit. See *In re Passaic County Utilities Auth.*, 164 *N.J.* 270, 306–07, 753 *A.2d* 661 (2000) (invalidating utility authority's imposition of Environmental Impact Charge on non-users but deferring effective date of judgment for ninety days to provide opportunity for legislative action). In my view, the language of the Debt Limitation Clause that applies only to debt "of the state" that the Legislature "create[s] in any fiscal year" clearly precludes that expansive interpretation of my analysis. *N.J. Const.*, art. VIII, § 2, ¶ 3.

In *Salorio v. Glaser, supra,* 93 *N.J.* 447, 461 *A.*2d 1100, we invalidated under the Privileges and Immunities Clause, *U.S. Const.,* art. IV, § 2, a portion of the Emergency Transportation Tax Act allocated to the Transportation Fund and used to alleviate commuter transportation problems on the ground that the Act discriminated against New York commuters with New Jersey income. *Id.* at 458–62, 461 A.2d 1100. Although *Salorio* was decided on June 8, 1983, the Court permitted the State to continue to collect the ETT tax on income earned prior to January 1, 1984. In determining to grant only prospective relief, the Court relied in part on the United States Supreme Court's decision in *Lemon v. Kurtzman (Lemon II), supra,* 411 *U.S.* 192, 93 *S.Ct.* 1463, 36 *L.Ed.*2d 151, holding unconstitutional a Pennsylvania statute permitting state reimbursement to private sectarian schools for secular educational services, *but permitting the State prospectively to pay for services rendered prior to the Court's decision.* We observed:

> Chief Justice Burger, writing for the Court, stated that retroactivity depended upon a consideration of the particular relations between and conduct of the parties, of rights that had vested, of status, of prior determinations deemed to have finality, and of public policy. He stressed that statutory law is a "hard fact[ ] on which people must rely in making decisions and in shaping their conduct." 411 *U.S.* at 199, 93 *S.Ct.* at 1468, 36 *L.Ed.*2d at 160. He also noted that the problem before the Court was "essentially one relating to the appropriate scope of federal equitable remedies, a problem arising from enforcement of a state statute during the period before it had been declared unconstitutional." *Id.,* 411 *U.S.* at 199, 93 *S.Ct.* at 1469, 36 *L. Ed.*2d at 161. Equitable remedies, he wrote, "are a special blend of what is necessary, what is fair, and what is workable." *Id.* at 200, 93 *S.Ct.* at 1469, 36 *L.Ed.*2d at 161 (footnote omitted).
>
> "[R]eliance interests weigh heavily in the shaping of an appropriate equitable remedy." *Id.* at 203, 93 *S.Ct.* at 1471, 36 *L.Ed.*2d at 163; *see also Chevron Oil Co. v. Huson,* 404 *U.S.* 97, 92 *S.Ct.* 349, 30 *L.Ed.*2d 296 (1971). This is particularly so in this case where invalidation of the ETT tax blocks a source of revenue heretofore available to the state. Our holding today is the equivalent of a new rule of law. *Cf. State v. Burstein,* 85 *N.J.* 394, 406, 427 *A.*2d 525 (1981). Under these circumstances, as Judge Conford expressed in *Oxford Consumer Discount Co. v. Stefanelli,* 104 *N.J.Super.* 512, 520, 250 *A.*2d 593 (App.Div.1969), aff'd, 55 *N.J.* 489, 262 *A.*2d 874 (1970):
>
> There is no question but that appellate courts in this State and elsewhere have long regarded themselves as empowered and justified in confining the effect of a decision of first impression or of novel or unexpected impact to prospective

application if considerations of fairness and justice, related to reasonable surprise and prejudice to those affected, seemed to call for such treatment.

Foremost among the factors to be considered is the State of New Jersey's justifiable reliance upon the availability of the ETT funds. We have consistently and frequently advised that a duly enacted statute is presumptively valid. The officials, legislative and executive, were entitled to rely on that presumption....

*The legislative and the executive branches of government have relied on the ETT for many years in preparation of budgets, with respect to both income and expenditures, and in making appropriations and expenditures. The expenditures cannot be undone and reimbursement would have a substantial effect on the State's existing financial requirements. Public fiscal stability is at issue.*

. . . .

*We are persuaded to fix a prospective date because of our concern for the fiscal and administrative problems that would be engendered if the State were compelled to surrender ETT receipts before the end of the fiscal year. The State should be afforded a reasonable period of time to devise alternative revenue raising methods, abandon or postpone transportation projects or consider some other suitable solutions. We believe that relief against enforcing the ETT tax with respect to income earned on and after January 1, 1984 will accommodate these concerns. This date is also coordinate with the fiscal year of most individuals and will permit employers and employees sufficient opportunity to solve any bookkeeping or related problems.*[13]

[*Id.* at 464–65, 467–68, 461 *A.*2d 1100 (footnote omitted) (emphasis added).]

As we noted in *Salorio,* the practice of deferring to an appropriate prospective date potentially disruptive judicial decisions implicating significant statutory and constitutional holdings "accords with relief that we have afforded the Legislature or other governing bodies in comparable cases." *Id.* at 468, 461 *A.*2d 1100. In *Robinson v. Cahill,* 63 *N.J.* 196, 198, 306 *A.*2d 65 (1973) (Robinson II), decided June 19, 1973, following this Court's earlier holding

---

[13] Subsequent to *Lemon II,* the Supreme Court modified its civil retroactivity jurisprudence to require that a rule of federal law, once announced and applied, "must be given full retroactive effect by all courts adjudicating federal law." *Harper v. Virginia Dept. of Taxation,* 509 *U.S.* 86, 96, 113 *S.Ct.* 2510, 2517, 125 *L.Ed.*2d 74, 86 (1993). However, as noted by the Justices whose view of civil retroactivity prevailed in *Harper,* the holding in *Lemon II* "concerned not the application of a new constitutional or statutory rule, but rather the relief that a federal court should award when applying the new law," and that in remedy cases "consideration of reliance might be appropriate." *American Trucking Assn. v. Smith,* 496 *U.S.* 167, 223, 110 *S.Ct.* 2323, 2355, 110 *L.Ed.*2d 148, 189 (1990) (Stevens, J., dissenting).

invalidating as unconstitutional the State's statutory scheme for funding public education, *Robinson v. Cahill,* 62 *N.J.* 473, 520, 303 *A.*2d 273 (1973) (Robinson I), the Court determined not to "disturb the [existing] statutory scheme unless the Legislature fails to enact, by December 31, 1974, legislation compatible with our decision in this case and effective no later than July 1, 1975." Similarly, in *Abbott v. Burke,* 119 *N.J.* 287, 386, 389, 575 *A.*2d 359 (1990) (*Abbott II*), we held that the State Constitution required funding parity between the Abbott districts and the so-called I and J districts but determined that parity funding "need not be fully implemented immediately, but may be phased in." Subsequently in *Abbott III, Abbott v. Burke,* 136 *N.J.* 444, 447, 643 *A.*2d 575 (1994), we stated that we would not intervene further if funding parity between the Abbott districts and the wealthier districts was achieved by the 1997–98 school year. In the landmark case of *Switz v. Middletown Twp.,* 23 *N.J.* 580, 130 *A.*2d 15 (1957), the Court determined that to achieve compliance with both constitutional and statutory assessment requirements the Township would be obligated in the future to assess all land at true value, but determined that its mandate would not apply during the two ensuing tax years to afford the Legislature adequate time to provide for essential administrative procedures. *Id.* at 598, 130 *A.*2d 15. As noted in *Salorio,* the deferral of the effective date of significant constitutional adjudications by this Court is well supported by our precedents.

Accordingly, I would give only prospective effect, commencing January 1, 2004, to my conclusion that the issuance of appropriations debt without voter approval by independent State authorities, unsupported by an adequate independent revenue source and to be amortized by annual legislative appropriations, violates the Debt Limitation Clause of the State Constitution. I elect to apply that determination prospectively in view of the reliance on our decision in *Abbott V* by the legislative and executive branches in enacting the Education Facilities Construction and Financing Act, and because of their longstanding reliance on this Court's Debt Limitation Clause jurisprudence over the past fifty years. In

fixing the effective date of my determination, I also have considered carefully the time likely to be required for preparation, legislative adoption, and public approval of any constitutional amendment determined to be appropriate.

After its effective date, my proposed holding would apply only to appropriations debt proscribed by this opinion the issuance of which is authorized by legislative enactments adopted after January 1, 2004. Accordingly, the validity of bonds authorized pursuant to the EFCFA and issued after January 1, 2004 would not be affected by my disposition, nor would it apply to appropriation bonds authorized by other statutes enacted prior to that date but issued subsequent to it. I anticipate that my disposition, and its prospective application, would not affect the ability of Bond Counsel to issue legal opinions related to the authorization, execution, issuance, delivery and constitutionality of any appropriation bonds the validity of which is unaffected by our disposition.

IV

The decisions below are a classic illustration of the familiar adage that hard cases make bad law. Understandably, our courts are disinclined to upset on constitutional grounds a badly needed school construction bond issue that this Court determined to be constitutionally mandated, at least for the Abbott districts. Nor is there likely to be enthusiasm for invalidating a bonding mechanism, widely used not only by New Jersey but also by many other large sophisticated state borrowers, that arguably has been endorsed by prior decisions of this Court.

But the coalescence of incontestable facts and sound legal analysis virtually compels the Court to apply the Debt Limitation Clause to a state authority's appropriation debt not approved by the voters and unsupported by an adequate independent revenue source. Prior to and including the *Enourato* decision in 1982, the use of appropriation debt had been contained and carefully limited. This Court was so cautious about its constitutional validity that it divided 4–3 in the Sports and Exposition Authority litiga-

tion, three members being of the view that the Act invalidly committed the future use of pari-mutual revenues even though the Authority's bonds were to be amortized by the revenues from the Sports Authority's operations, an independent revenue source. In recent years, however, the State increasingly has relied on appropriations debt to the extent that the $10.8 billion in appropriation bonds now outstanding constitutes about seventy-five percent of the State's bonded debt. The cat, so to speak, is out of the bag. That the State is required to pay its appropriation debt, as a practical matter, is indisputable. No longer is it tenable, at these enhanced levels of appropriation debt, to argue that the State is not liable because its credit is not legally pledged. As the record demonstrates, most of the State's appropriation debt has no revenue source other than State appropriations, and so the State's credit is committed whether or not it signs on the dotted line.

Thus, the reality is that appropriations debt has become a legal artifice that permits the State to issue debt through State authorities, without voter approval, that future legislatures are obligated to repay. Its use is simpler, more convenient, and more efficient than general obligation debt. Unless the Court eventually intervenes, I infer that the State's use of general obligation debt requiring voter approval will continue to decrease.

The institutionally responsible answer is to recognize that the Constitution can be amended but it cannot be ignored. If the Legislature and the voters prefer, the legality of appropriation debt can be detached from the limits imposed by the Debt Limitation Clause, and a different standard for issuance of appropriation debt can be written into the Constitution that more accurately relates to the State's fiscal capacity to carry that debt. I am confident that the exercise of sound judgment by the other branches of government can address and resolve any limitations that this opinion may impose. In my view, the judiciary has no choice but to acknowledge and confront the constitutional detour that has been tolerated for too long. Appropriations debt issued by an independent state authority without voter approval, unsup-

ported by an adequate independent revenue source and amortized by annual legislative appropriations no longer can be reconciled with the Constitution. In my view, any such debt statutorily authorized after January 1, 2004, should not be considered validly issued debt under the Debt Limitation Clause.

For the reasons stated, I would affirm but modify the judgment of the Appellate Division.

*For affirming*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, and LaVECCHIA—5.

*Concurring in part/dissenting in part*—Justice STEIN—1.